UNITED STATES of America,
Appellee,

v.

James DeMASI, Appellant.

No. 1002, Docket 71–1050.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1971.

Decided July 9, 1971.

**252**

James Schreiber, Robert G. Morvillo, Asst. U. S. Attys., Whitney North Seymour, U. S. Atty., for appellee.

Irving Anolik, New York City, for appellant.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and ZAVATT, District Judge.*

WATERMAN, Circuit Judge:

After a trial before a jury, appellant James DeMasi was convicted on two counts of violating the Hobbs Act (18 U.S.C. § 1951) by interfering with interstate commerce through attempts to gain control of a night club in New Rochelle, New York, by force and violence, and was also convicted on one count of conspiring to violate that section. He was sentenced to concurrent sentences of ten years on each count, but has been enlarged on bail pending determination of this appeal.

The events giving rise to this prosecution occurred in 1963. Sensing an unexploited market for a "family-type" night club in New Rochelle, one Edward Blackoff, in March of that year, opened the "Round-A-Bout Club" which provided restaurant and bar facilities as well as a bandstand for "live" music. Sometime in April appellant, also known as "Jimmy Dimps," visited the Club around closing time and asked to speak to Blackoff. In the presence of the Club's manager, Jack Withrow, appellant related that he had heard that Blackoff had said that "no racket guys or unsavory characters were going to be allowed in the Club and that he in particular was barred." Blackoff denied that he had made the statements. He added that he did not know appellant and he concluded the conversation by assuring DeMasi that he was welcome as long as he behaved himself. Appellant thereupon became a regular customer, stopping in three or four times a week.

In the early part of May the Club's bartender, Vincent "Cha Cha" Aiello, told Blackoff and Withrow that they "could expect to be visited by a group of well-known racket men * * * [because they] had heard so much about [the Club]." A few evenings later Aiello introduced three men to Blackoff and Withrow: Nickey Nelson,[1] Matty (Nelson's bodyguard), and "F. O.," manager of a Bronx bar. DeMasi was already present in the bar and these men joined him at a table. Later that night the Club experienced its first disruption. Two men, each over six feet in height, claiming to have been short-changed,

---

* Of the Eastern District of New York, sitting by designation.

1. This name was an alias. Nelson's name is Nicola Melillo, but for the sake of clarity we refer to him herein as Nelson.

broke glasses, shouted obscenities, and created a disturbance. Withrow was unable to calm them. Nelson's bodyguard, Matty, was equally unsuccessful. It was Nelson himself, a man of much smaller size, who escorted the two to the door without resistance. Meanwhile Blackoff, who had heard the commotion while in the restaurant, entered the bar as the men were being ejected. He thanked Nelson and ordered free drinks for his party. Nelson urged Blackoff to learn the identity of the men because they had not respected his presence. DeMasi added that they "deserved to get their lumps," and Nelson gave Blackoff the telephone number of F. O.'s bar in the Bronx, making it clear that he was to be informed if the men returned so that he could punish them.

About a week later the two troublemakers returned to the Club demanding that they be compensated for damage allegedly done to their clothes when they were ejected. When Withrow refused, the men threatened to wreck the Club. However, Blackoff mentioned that Nelson was looking for them and the men became less adamant in their demand. Blackoff gave them a check and they left.[2] As they were driving away, Withrow copied down the car's license number.

A couple of days later Nelson and Matty appeared at the Club to inquire about the return of the two men. Blackoff and Withrow explained what happened. Nelson then asked for the license number because, he asserted, he had access to police records and could discover the identity of the car's owner. Further he pledged that the men would be punished. Subsequently, Aiello told Blackoff that Nelson had located the troublemakers who were "connected with other gangsters" and that they had been punished. Blackoff was to consider the

matter closed. Nonetheless, the effect of these and later disturbances on the Club's business was dramatic. By June the family groups stopped coming, and business went steadily downhill.

During the earlier part of June appellant became increasingly disruptive while at the Club and frequently refused to pay his bills. On a Friday, after arriving in the company of a woman and another man, he started to swear loudly and break some glasses. He was asked to leave by another customer who claimed that he had a one-third interest in the Club.[3] When appellant heard this, he said, "We will see who owns one-third of this Club," and told Blackoff that, inasmuch as Blackoff had been using Nickey Nelson's name, "I am going to fix you." He then ran to a hallway telephone and made a call. Blackoff overheard DeMasi tell the other party that he was at the Club, that "there was a lot of trouble here," and that his listener should "come up right away." Shortly thereafter Matty arrived with four or five "tough-looking" men and conferred with appellant. Both then approached Blackoff. Matty repeated the charge that Blackoff had used Nelson's name without authority to do so and added that Blackoff would have to pay for it. Blackoff again denied the charge, and, after further verbal exchanges, DeMasi, Matty, and the others left.

In order to resolve the misunderstanding, Blackoff and Aiello on Saturday drove to the Bronx bar managed by F. O., ostensibly to drop off some glasses F. O. had wanted but, in fact, to see Nelson.[4] Blackoff carried the glasses into the bar and gave them to F. O., who at the time was standing behind the bar counter. Looking into the mirror behind the counter, Blackoff noticed one of the two men who had caused the trouble

---

2. The check was never cashed.

3. This statement was false; the Government did not seek to explain why it was made.

4. Previously, when F. O. had been at the Club with Nelson, Matty and appellant, F. O. had admired the "old fashioned" glasses used there and asked Blackoff to order some for his bar.

at his Club and who supposedly had been punished by Nelson. He also saw Matty calmly standing not far from the troublemaker. At this point Blackoff realized that the two disturbances at the Club had been staged, and he sought a quick exit. However, as he neared the door, he was accosted by Matty who repeated the charges from the evening before and demanded in addition that he be made manager of the Club. Blackoff responded that he already had a manager, namely Withrow, but Matty was unimpressed. He told Blackoff that unless he was made manager, the "Club would be wrecked * * *, [he] would be beaten up [and his] wife and child would be beaten with lead pipes filled with cement * * *." Matty demanded an answer by evening.

Blackoff returned to the Club and related the events to Withrow, a waitress, and Lemanno, a butcher from Connecticut who provided the Club's meat requirements. Lemanno suggested that Blackoff contact some men in the Bronx known to Lemanno who would know about Nelson and Matty so that Blackoff could evaluate the demand, and they left together in search of the information. Soon after, Matty arrived at the Club demanding to see Blackoff. Withrow explained that Blackoff was not there but Matty decided to await his return. As the delay grew longer, Matty became impatient and struck Withrow.

During the evening Blackoff called the Club to ask if Matty was waiting for him and he received an affirmative answer. He called again still later to speak with Withrow, but Matty grabbed the telephone from Withrow and ordered Blackoff to return to the Club. When Blackoff arrived, Matty struck him, repeated his demands, and warned Blackoff not to contact the police. He said that once he was taken in as manager, he might buy out Blackoff after a year, but he mentioned no price. He also assured Blackoff that should he be made manager, no more men would be demanding money, and that there would be

no more disruptions and appellant, especially, would be kept out. Blackoff equivocated, and after a few drinks Matty departed.

On Sunday Withrow learned from a waitress that some men were "going to come up * * * and beat everybody up [in the Club] with lead pipes * * * and smash the Club." That evening DeMasi and approximately fifteen men filed into the Club and marched to the bar, where they proceeded to harass Aiello. Very shortly thereafter Matty called Blackoff to ask how things were going. Blackoff told him that appellant was there with fifteen men who "looked like they were going to start causing trouble" and asked Matty to "get them out." When Matty arrived, he spoke quietly with DeMasi, and, following this talk, DeMasi and his cohorts left.

Blackoff thereupon told Matty that he would not go through with the proposal, saying that he would rather close the Club. Matty repeated his threats but to no avail. Blackoff demanded that he leave and Matty, being cooperative, agreed to go if Blackoff would drive him to F. O.'s bar. Blackoff declined but Aiello volunteered.

Aiello returned sometime later that night in a frightened state. He had spoken with Nelson, Matty and F. O., and he told Blackoff that they would give Blackoff "one hour" to reconsider or they would come up and "take care of him." Blackoff listened to Aiello and then ran from the Club to flag down a police car. He explained to the officer what was happening and the officer agreed to watch for Nelson's arrival. Later the officer stopped a car that had been circling the Club; it contained Nelson and an unidentified passenger. Nelson did not enter the Club.

On Monday Blackoff went to the New Rochelle police and disclosed the extortion scheme. In September, 1963, business having fallen off completely, he closed the Club.

The federal grand jury indictment charging appellant, Melillo (Nelson) and a still unidentified "John Doe" was filed almost four years later, in March, 1967. Appellant argues that this lengthy pre-indictment delay violated his right to a speedy trial as guaranteed by the Sixth Amendment and Rule 48(b) of the Federal Rules of Criminal Procedure. However, appellant does not claim that the statute of limitations had run, and, "[w]here there has been a pre-arrest delay the statute of limitations is 'usually considered the primary guarantee against bringing overly stale criminal charges,' United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)," United States v. Feinberg, 383 F.2d 60, 64 (2 Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968). See also United States v. Quinn, 445 F.2d 940 (2 Cir. June 4, 1971). Of course, even within the limitation period, if the delay "impair[s] the capacity of the accused to prepare his defense," it may nonetheless reach constitutional proportions, if the prejudice is proven. United States v. Feinberg, supra, 383 F.2d at 65. However, courts will not presume the existence of prejudice from the mere fact of delay alone. Id. In the instant case no proof of prejudice has been offered. Appellant's freedom of movement was not curtailed nor was he subjected to derogatory publicity or public disdain. Furthermore, appellant has failed to substantiate his naked assertion that the pre-arrest delay hampered his preparation for trial. Apparently no key defense witnesses died or otherwise became unavailable during this period. Additionally, there is no suggestion in the record or elsewhere that potential or actual witnesses were unable to recall the events in the past, or that evidence was destroyed or mislaid. Under these circumstances, then, the pre-arrest delay worked no hardship on appellant.

Nor is there proof that the delay was actuated by a deliberate, purposeful or oppressive design on the part of the Government. Chapman v. United States, 376 F.2d 705 (2 Cir.), cert. denied, 389 U.S. 881, 88 S.Ct. 119, 19 L.Ed.2d 174 (1967). On the contrary, the Government has explained that the delay was due simply to the fact that the federal authorities did not become involved in the case until very late in 1965 and the year which elapsed between the time of initial involvement and indictment was devoted to investigation and preparation for presentation of the case to the grand jury. Although the constitutional and social imperatives in the speedy trial concept are deeply embedded in our jurisprudence, nonetheless we have also recognized that careful investigation, even at the price of delay, is to be cherished, inasmuch as "[t]ime-consuming investigation prior to an arrest minimizes the likelihood of accusing innocent parties and may facilitate the exposure of additional guilty persons." United States v. Feinberg, supra, at 64–65. In the instant case the investigation failed to turn up the unidentified "John Doe," but this does not alter the principle. Weighing these policies, we deem the excuse sufficient.

Nor do we believe that the post-indictment delay was constitutionally intolerable. As we have said so many times in the past, we look to four factors: The length of the delay, the reason for the delay, prejudice to the defendant, and waiver of the speedy trial right by the defendant. United States v. Lustman, 258 F.2d 475 (2 Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958); United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2 Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969).[5] Appellant's argument that he suffered actual prejudice because Aiello died in November 1968, and was unable to testify at trial, is without merit. There is no indication that Aiello would have exculpated appellant had he lived to testify, and, indeed, it appears that Aiello would have

5. See Second Circuit Rules Regarding Prompt Disposition of Criminal Cases.

been more helpful to the Government than to the defense.

■■■ Furthermore, appellant's assertion must fall because he failed to move for a speedy trial. In March, 1970, the Government informed appellant that it would seek to bring this case to trial. Only then did appellant file a motion to dismiss the case for lack of prosecution. The motion was denied. The rule in this Circuit is clear that a motion to dismiss for lack of prosecution is not a proper demand for a speedy trial. United States v. Virga, 426 F.2d 1320, 1322 (2 Cir. 1970); United States v. Aberson, 419 F.2d 820 (2 Cir.), cert. denied, 397 U.S. 1066, 90 S.Ct. 1497, 25 L.Ed.2d 687 (1970); United States v. Maxwell, 383 F.2d 437, 441 (2 Cir. 1967), cert. denied, Aiken v. United States, 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968). Furthermore, "[e]ven were we to treat the [March, 1970] motion to dismiss made by [defendant] as a demand for a speedy trial, which we do not," appellant went to trial six months later, in October, a period not unreasonable in length, United States v. Maxwell, *supra*, 383 F.2d at 441. Cf. United States v. Taddeo, 434 F.2d 228 (2 Cir. 1970), cert. denied, 401 U.S. 944, 91 S.Ct. 957, 28 L.Ed.2d 226 (1971); United States v. Simmons, 338 F.2d 804 (2 Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965).[6]

At trial the Government was permitted, over objection, to ask Blackoff and Withrow about statements the deceased Aiello had made to them. The thrust of appellant's argument is that these out of court statements were hearsay and that their admission precluded a fair trial under the Fifth and Six Amendments inasmuch as they contained references to appellant and others as "gangsters" and "racket men."

The Government seeks to justify the first statement (that Blackoff and Withrow "could expect to be visited by a group of well-known racket men * * *") on the ground that the statement was circumstantial evidence tending either to prove the existence of the conspiracy or to show the state of mind of the listener. It refers us to Braswell v. United States, 200 F.2d 597 (5 Cir. 1952), to support its contention that the declaration tended to prove the existence of the conspiracy. However, in that prosecution for possession of narcotics, narcotic agents were permitted to testify as to conversations they heard coming from the cabin occupied by the defendants "not as hearsay evidence of the truth of the statements, but as circumstantial evidence of the guilty possession of marihuana." *Id.* at 599. In this case the declaration testified to was not made by an alleged co-conspirator. Hence the only rationale for the admission is that Aiello would not have made the statement if a conspirator or some other person had not told him that those men were coming. Reduced to its constituent elements the statement becomes "X told me that 'some well-known racket men' are coming," and this presents a classic example of inadmissible hearsay. Cf. United States v. Bennett, 409 F.2d 888, 895 n. 6, 897–898 (2 Cir.), cert. denied, sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969).

■■■ The Government's alternate theory to justify the admissibility of the declaration, that the statement was relevant to prove the victim's state of mind, was not suggested at trial, and the court did not instruct the jury with reference to it; therefore we will not consider it.[7]

---

6. Judge Croake denied the motion to dismiss in June, 1970. The case was set down for trial to begin August 17, 1970. However, shortly before trial, appellant requested an adjournment, which was granted. Trial finally began on October 26, 1970. Hence the six month figure is exaggerated, and, of course, any delay occasioned by defendant cannot be relied on by him as a ground upon which to assert a denial of the speedy trial right.

7. See, however, United States v. Kennedy, 291 F.2d 457 (2 Cir. 1961).

Assuming, then, for the purposes of this case that the admission of this testimony was erroneous, we turn to consider the magnitude of the error in relation to the overall posture of the Government's admissible proof. We can discern no prejudice from a hearsay statement that some unidentified men would make a visit; the existence of any probative value in this statement is dubious. Only the characterization of these men as "well-known racket men" can be objectionable, but inasmuch as appellant's counsel elicited the same characterization of them later in the trial from another source, Aiello's statement is only cumulative, and we deem its admission not to be prejudicial error.

■ Appellant also complains that another statement made by Aiello that the troublemakers had been located and that they "were connected with other gangsters" was inadmissible, and that, even though the district court had so ruled, the fact that the statement was made prejudiced him. The claim of prejudice arises from the circumstances that, on cross-examination of Blackoff, counsel for appellant returned to the subject by asking Blackoff whether he "knew that he [the appellant] was a racket figure." Blackoff answered "I knew he was in the rackets." and, in the ensuing questions and answers, Blackoff stated he was told so by Aiello. Surely appellant cannot complain that he was prejudiced by the former stricken statement in light of the fact that he reopened the subject matter himself. Further, the evidence was admitted not as tending to prove that DeMasi and the others were in fact gangsters but only as tending to prove that Blackoff thought they were.

■ Reversal is also urged because appellant claims that statements regarding his violent nature should have been excluded. While it is generally true that a defendant's character cannot be impeached unless he first puts it in issue, see Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), nonetheless this case does not fall within the general rule. In a Hobbs Act case, the Government must prove that property was extorted from the victim by threats of violence or because of the victim's fear. Hence appellant's reputation for violence is relevant as one of the crucial factors in determining this element. Inasmuch as the prosecution provided appellant with advance warning that this evidence would be introduced and the district court carefully cautioned the jury on the limited use of this testimony, there was no error. United States v. Tropiano, 418 F.2d 1069, 1081 (2 Cir. 1969), cert. denied, Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970); Carbo v. United States, 314 F.2d 718 (9 Cir. 1963), cert. denied, Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Furthermore, no objection or exception was taken to the admission of this testimony at trial. Fed.R.Crim.P. 52(b).

■ We find no merit in any of the other claims assigned as error. With reference to the argument that the Government failed to prove an effect on interstate commerce, we note only that the Club purchased its meat in Connecticut and its liquor both nationally and internationally, and that when the Club closed these deliveries were stopped. The requisite effect was proven. Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Tropiano, *supra*.

Affirmed.