**UNITED STATES of America**

v.

**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA et al., Defendants.**

**No. 70–CR–428.**

United States District Court, E. D. New York.

May 25, 1972.

---

Robert A. Morse, Esq., U. S. Atty., E. D. N. Y., Brooklyn, N. Y., by Edgar N. Brown, Gregory Jones, John E. Clark, Special Attys., Dept. of Justice, Criminal Div., Washington, D. C., and Gavin Scotti, Brooklyn, N. Y., for United States.

Schulman, Abarbanel, Perkel & McEvoy, by Howard Schulman, and Andrew T. McEvoy, New York City, for defendant Seafarers International Union.

Rosner & Rosner, by Jonathan L. Rosner, New York City, for defendants Paul and Frank Drozak.

Goldstein, Shames & Hyde, by Edward Brodsky, New York City, for defendant Al Kerr.

Davis, Polk & Wardwell, by Lawrence E. Walsh, Michael W. Leisure, Richard J. Hoskins, and Richard L. Grimwade, New York City, for defendants Paul Hall and Earl Shepard.

Abraham Brodsky, New York City, for defendants Philip Carlip and Joseph DiGiorgio.

MEMORANDUM OPINION

*Failure to Comply with Pretrial Disclosure Orders*

COSTANTINO, District Judge.

By way of an indictment filed in this court on June 30, 1970, the Government charges that the Executive Board of the Seafarers International Union met on August 27, 1962 to create a special political action fund—Seafarers Political Activity Donation (SPAD). The Government further charges that SPAD was nothing more than a device used by the union to conceal unlawful political contributions.[1] In furtherance of the conspiracy, the Government alleges that the defendants, through SPAD, received contributions from seamen scattered throughout the world and made unlawful political contributions totaling more than $750,000 in connection with federal elections in the years 1964 through 1968.[2]

Now, ten years after the alleged beginning of the conspiracy and four years after the last wrongful act charged in the indictment, the defendants move for dismissal. Basically, the defendants set forth two grounds for dismissal—failure of the Government to comply with the pretrial orders of this court and for want of a speedy trial. In order to conserve judicial time and energy, the court will rule on both branches of this motion in bar.

■ As the court and parties know all too well, this criminal prosecution has been the subject of lengthy pretrial proceedings before two judges of this court.[3] These proceedings have resulted in orders granting most of the defendants' requests under rules 7(f), 16 and 17 and providing them with information that they, as well as the court believed to be essential to informing them of the crime with which they are being charged in addition to providing information necessary to defense preparation. In moving dismissal, the defendants argue that the Government has disregarded the orders of this court by supplying answers that are partially incomplete and at times at variance with each other.[4] The Government, on the other hand, contends that even though some of the court's orders went beyond what the Government believed case law required, it, nevertheless, has complied in good faith and to the best of its ability. Further, the Government suggests the defendants' objections are little more than challenges to the quantum and quality of the evidence the Government will educe at trial rather than being valid objections to the Government's compliance with the court's orders. After listening to the oral argu-

1. The substantive wrongs charged by the Government in this 17-count indictment involve violations of the Federal Corrupt Practices Act, 18 U.S.C. § 610 (1970), which provides in pertinent part:
It is unlawful for any . . . labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

2. The substantive counts of the indictment deal specifically with SPAD con-

tributions to the Republican Congressional Campaign Committee and the Humphrey-Muskie Campaign Committee in 1968.

3. Since the second branch of the defendants' motion—dismissal on grounds of oppressive and prejudicial delay—requires a discussion of the pretrial stage of this litigation, rather than duplicating that effort here, the discussion has been included in a later and more appropriate place in the opinion.

4. The defendants do not complain that all the answers to their discovery and bill of particulars motions were unsatisfactory. They do argue, however, that the nonresponsive answers of which they complain involved areas critical to the defense.

ments of very able counsel and upon re-reading the voluminous record, the court must grant this branch of the defendants' motion.

At the December 15, 1971 hearing on the defendants' pretrial motion and in a written order filed by the court on January 25, 1972, the Government was directed and redirected on March 23, 1972 to provide answers to bill of particulars requests designated as I–A, I–B, I–C, III–B, III–C, III–G(ii), III–I(ii)–(v) and III–M. These requests were designed to inform the defendants of: (1) the composition of the SPAD fund; (2) the circumstances surrounding contributions to SPAD, and (3) overt acts not listed in the indictment upon which the Government intended to offer proof on trial. After examining the Government's responses in each of these three topic headings, noncompliance is manifest.

### Composition of the Fund [5]

At the outset, the Government theorized that SPAD was merely the alter ego of the union itself. See Indictment Count 17. Consequently, from the Government's viewpoint, it served no purpose to categorize the type of monies collected in the fund since any act of SPAD would in itself be deemed an act of the union, and, therefore, be proscribed by the statute. See note 1 *supra*. Later, during an informal hearing before Judge Bartels, the Government stated it was not certain who had contributed to the fund but refused, in any case, to categorize the type of monies in the fund. On December 15, 1971 this court directed the Government to furnish in a bill of particulars information concerning the fund's composition. A response came on February 10, 1972 and consisted of two representations by the Government: first, it had no information other than that which it learned from the union's cash receipts and, second, that it did not allege "other monies collected from members of the Union" or "other monies collected from

persons required to pay or tender Union membership obligations" to be sources of SPAD fund monies. Then, after being redirected by the court to respond, on April 24, 1972, the Government answered that some of the money in the fund came from dues, union assessments, fines, penalties, *"other monies collected from members"* and *"other monies collected from persons required to tender or pay union membership obligations,"* with the bulk of the fund coming from involuntary contributions. Moreover, the Government claimed it had no data on what portion of the fund was attributable to each of the categories nor did it explain its inclusion 22 months after the filing of the indictment of two categories of sources that were specifically excluded 20 months after filing the indictment.

Again responding, though still offering no explanation for expanding its list of alleged sources, the Government reaffirmed its inability to provide information concerning the amount of monies collected annually on a category basis. The Government, instead, continued to rely on a chart it furnished showing for the years 1966–1968 the source and amount of SPAD receipts for each union membership classification. The Government also noted the prior disclosure of its position on the voluntariness or involuntariness of SPAD contributions as keyed to the various union membership classes.

In light of these arguments, the court has no choice but to find inexplicable inconsistencies in the Government's responses. Further, the court finds the Government's failure to state the amount of monies attributable to each alleged category is in itself noncompliance with the court's order. Obviously, for the Government to state in good faith that some of the monies in the fund were attributable to each category directly implies that, at bare minimum, the Government must have information to show at least one contribution for each category in at least one of the years covered by the

5. Information concerning the fund's composition was required by the defendants not only to enable them to prepare for a trial but also to enable them, if the facts warranted, to move for dismissal on constitutional grounds.

indictment. Yet, the Government professes it has no data that will provide this information. Clearly, contradictory responses cannot even be raised to the level of colorable compliance. Thus, on the issue of fund composition, the Government has failed to comply with the court's pretrial orders.

### Contributions to SPAD [6]

With respect to contributions deposited in the SPAD account chargeable to other monies collected from members of the union as well as from persons required to pay or tender union membership obligations, the court directed the Government to particularize the circumstances under which these monies were collected. In its original February 1972 response, the Government did not furnish these particulars because it represented that it did not allege either of these categories to be sources of SPAD funds. Changing its position two months later, the Government referred the defendants to a computer printout from the union's electronic data tapes.

The Government argues that the computer printouts provide the defendants with a complete and informative record of each transaction resulting in a contribution to the SPAD account—name of the seaman, his book number and membership classification, the port of pay-

ment together with the amount of payment and the identity of the port agent, in addition to the receipt number of the payment. Further, the Government notes, it attached explanations of the port and port agent codes utilized in the printouts. Arguing on a different plane, the Government also contends the defendants' reliance here on language used by this court in its memorandum and order of March 30, 1972 is misplaced. The Government points out that the language used by the court related to request III–M concerning overt acts rather than relating to requests dealing with the circumstances surrounding contributions to SPAD.

The Government's response fails to comply with the orders of this court. Its response particularized neither the conversations nor the circumstances surrounding contributions made to the SPAD account. Though the Government is correct in stating that the language quoted from the court's memorandum and order dealt specifically with request III–M, it is also unquestionable that the court·on that point was dealing with the very nature of the computer printout data. Surely information the court expressly found not in compliance with a direction to give the circumstances involved in one type of transaction cannot be held to be compliance with a similar order respecting other transactions.[7]

6. Especially since the Government's case must succeed or fail with its ability to show the involuntariness of contributions to SPAD and considering the *minimum* lapse of four years between the time of contribution to SPAD and the time of trial, the defendants' need for specification of circumstances is almost self-evident. The fact that none of the individual defendants were present at the time contributions were made only serves to reinforce the argument supporting the court's order to disclose such information.

7. In this regard, the Government furnished printouts covering almost 400 transactions purporting to represent SPAD collections in various American and Far Eastern seaports. Yet, these printouts do not specify for the defendants which

individuals were coerced into contributing, to whom, when and where they gave the contributions nor does it specify the conversations and circumstances at the time the contributions were made. See *Memorandum and Order* of March 30, 1972, at 13. The printouts, for example, do not distinguish among Far Eastern ports nor do they inform the defendants of what the port agents said or did to obtain a contribution from a seaman nor does it reveal the seaman's response, nor the absence or presence of other people at the time of the contribution. Moreover, it must be called to mind again that nowhere is it alleged that any of the individual defendants collected or even witnessed any of the transactions listed by the Government. Furthermore, even the union, acting through these individual defendants, is without knowledge concern-

## Overt Acts [8]

The history of the Government's responses on this order are similar to its responses on the two previous orders. After the Government was directed to furnish the overt acts upon which it intended to rely, it turned over to the defendants a carton of computer printouts containing approximately 24,000 names and recording approximately 76,000 transactions resulting in contributions to SPAD. Additionally, the Government set forth eight alleged transactions with paraphrases of the conversations at the time of the transactions. When the court specifically held these responses not to be in compliance with the court's prior order, the Government pared its list to 14 pages of computer data involving 120 different seamen. The Government also increased from eight to 22 the number of transactions covered in nonprintout form.[9] These changes, however, do not affect the basic nature of the original response; a response held not to be in compliance with the court's orders. But, more importantly, this court warned in its March 30, 1972 memorandum and order that it would not be sufficient merely to reduce the number of transactions alleged to be overt acts. The court suggested to the Government then that it select a smaller number of transactions from the 76,000 *and* give the required information as to each of them. The Government cannot now expect the court to find anything less than that to be in compliance. Accordingly, the court must also find noncompliance as to this bill of particulars request.

■ Because of the Government's repeated failure to furnish the essential particulars that would comply adequately with the orders of this court, the court must grant the relief that it indicated it would grant pursuant to the terms of the March 30, 1972 memorandum and order. The mere conglomeration into one bill of particulars of earlier unsatisfactory responses—responses that failed to provide the defendants with information so vital to defense preparation—cannot now suffice to save the prosecution. United States v. Armco Steel Corp., 255 F.Supp. 841 (S.D. Cal. 1966). Consequently, this branch of the defendants' motion to dismiss must be granted. See 1 C. Wright, Federal Rules of Criminal Procedure § 130, at 295 (1969); cf. United States v. Nardolillo, 252 F.2d 755, 757 (1st Cir. 1958) (Government's refusal to turn over information).

### Purposeful and Prejudicial Delay

On this branch of their motion the defendants seek dismissal of the indictment on the grounds that the conduct of the prosecution has resulted in delay depriving the defendants of rights secured to them by the fifth and sixth amendments to the Constitution, rule 48 of the rules of criminal procedure and by the rules promulgated by the Second Circuit to insure the prompt disposition of criminal cases. Thus, since this branch of the motion calls into question the Government's conduct during pretrial proceedings in this case, the court must first set forth the history of those proceedings.

In September 1970, after the defendants had been arraigned, one of the defense counsel met with Government attorneys for the purpose of narrowing some of the issues presented by the indictment. At that conference, counsel attempted to arrive at an understanding of the Government's definition of "union

ing the circumstances surrounding these transactions. This information is essential to defense preparation. As this court noted in its last memorandum and order, *id.* at 14, if at this late date the Government has no information about specific transactions upon which it presently intends to offer evidence at trial, clearly, the defendants' right of confrontation cannot be secured.

8. See *Memorandum and Order* of January 25, 1972.

9. These transactions were given in response to bill of particulars request III–I–(iv)–(v) which the Government incorporated by reference into its response to request III–M.

funds," a critical term used in the indictment. The Government took the position then that all funds collected by representatives of the union, regardless of the voluntariness or involuntariness of such contributions, were included in the Government's definition of "union funds." Yet, despite the critical nature of this definition and despite a defense request to reduce this information to writing, on the day following the conference the Government refused to state in writing what it had told defense counsel orally at the conference.

A month later, Judge Bartels placed this case on his calendar for an informal conference. Prior to the conference, defense counsel forwarded to Judge Bartels and the Government a memorandum that outlined matters on which the defense requested pretrial disclosure. After hearing counsel, Judge Bartels directed the defendants to mail to the Government within two weeks a questionnaire designed to simplify the issues in the case. Seeking the Government's position as to the nature of SPAD and of the political contributions made by seamen, on November 6, 1970, the defendants forwarded their questionnaire to the Government. On December 15, 1970, the Government responded by mailing to defense counsel copies of the opinions delivered by the judges of the Eighth Circuit in United States v. Pipefitters Local Union No. 562, 434 F.2d 1116 (8th Cir.), aff'd en banc, 434 F.2d 1127 (8th Cir. 1970), cert. granted, 402 U.S. 994, 91 S.Ct. 2168, 29 L.Ed.2d 160 (1971) (Renumbered No. 70–74, 1971 Term)—a case the Government contends is virtually identical to the instant prosecution. (Until May 25, 1971, the forwarding of copies of the Eighth Circuit opinions was to be the sole Government response to the questionnaire propounded at the court's direction.) In light of the Government's

unresponsive answer, in January 1971 the defendants sought an order compelling answers to the inquiries contained in their questionnaire. On February 1, 1971, in its next communication with Judge Bartels, the Government sought a trial date. The defendants immediately made Judge Bartels aware of the Government's continuing unwillingness to provide the defendants with necessary pretrial disclosure and renewed their request to settle an order directing the Government to answer the questionnaire. Judge Bartels decided, however, to make another attempt at obtaining pretrial disclosure, setting the case down for a second informal hearing on May 14, 1971.

It is clear from the minutes of the hearing that Judge Bartels had a twofold purpose in summoning the parties before the court: (1) obviate the need for filing motion papers and (2) furnish the defendants with the information they were entitled to receive. Minutes of Hearing, May 14, 1971, at 4. The minutes of the hearing also reveal that Judge Bartels placed the Government on notice it would have to inform the defendants of the nature and composition of the fund, *id.* at 9, as well as the status of contributions to SPAD and to define the term "involuntary contribution," *id.* at 11–16, & *passim.* As the hearing wore on, Judge Bartels directed the defendants to review the minutes of the hearing and make a "motion for the residue [of information] that you didn't receive." *Id.* at 62. In addition, Judge Bartels directed that if any motions were to be made that they be served by June 30, 1971 and be returnable on July 8, 1971. *Id.* at 71. Complying with the court's direction, on June 29, 1971, the defendants served the Government and filed with Judge Bartels a comprehensive set of motion papers returnable on July 8, 1971.[10] Meanwhile, on May 25, 1971, the

---

10. The Government points out that a docket entry made by a deputy clerk of the court supports a finding that the defendants' motion papers were filed on July 9, 1971. The affidavit of service reveals, however, that the papers were served on June 29, 1971. The discrepancy in dates is attributable to the continuing practice of the defendants to deliver papers directly to chambers rather than filing them in the clerk's office. In order to resolve any doubt on this point, the court finds as a matter of fact that the papers were filed and served on June 29, 1971.

Government furnished its response to the questionnaire propounded on November 6, 1970. Contrary to the intent of Judge Bartels as manifested at the informal hearing 11 days earlier, however, the Government refused to answer almost all the inquiries directed at the nature and composition of the SPAD fund. Unquestionably, the need of proceeding by way of formal motion had not been diminished because of the Government's response.

Disregarding Judge Bartels' order of May 14, 1971, the Government served and filed its answering papers on July 16, 1971. Judge Bartels, however, was no longer available to entertain the motion. Two weeks later, on July 30, 1971, with the consent of this court and Judge Bartels, the case was formally reassigned pursuant to Rule 4, Individual Assignment and Calendar Rules, E.D.N.Y. By its letter of August 25, 1971, the Government then advised this court of the status of the prosecution. After informing the court of their pending motion, the defendants filed, in September, a reply affidavit to the Government's answering papers. The next communication with the court by either side came by way of a letter to the court from the Government in November 1971 requesting a conference to fix a date for trial. The court fixed December 8, 1971 as the date for the conference. From the date the Government "responded" to the questionnaire sent it by the defendants until the date set for the first conference with this court, the Government had not furnished the defendants any additional information.

Because the December 8, 1971 conference was set down by the court at the Government's request to fix a date for trial, the court, of course, assumed that the Government at least would be ready to do all that was necessary to clear the way for trial. Nevertheless, at the very outset of the conference, the Government informed the court it was not prepared to talk about the single, greatest roadblock to trial—the motion filed by the defendants over five months earlier. See Minutes of Hearing, December 8, 1971,

at 3. The Government then suggested the parties again try through informal meetings of counsel to voluntarily resolve their differences concerning the pending motion. When this procedure ended in failure, the motion was formally submitted to the court for decision.

At a second conference held on December 15, 1971, the court ruled on almost all of the requests contained in the defendants' omnibus discovery motion. The remaining request was disposed of in a memorandum and order filed by the court on January 25, 1972. As a result of the court's oral and written rulings most of the defendants' requests for particulars dealing with the nature of contributions to the SPAD fund and for other acts not contained in the indictment which the Government alleged violated the Federal Corrupt Practices Act were granted.

In response to the court's order to file a bill of particulars, the Government filed several pages of information expanding on the allegations of the indictment. On February 25, 1972 the Government filed another supplemental "bill of particulars"—a carton box containing an estimated 2000 pages of computer printout data covering *all* SPAD contributions, regardless of their voluntary or involuntary nature, from the 24,000 contributors to SPAD during the years 1966 through 1968. Accompanying the box of computer data was a representation by the Government that the data contained details of all the overt acts upon which the Government intended to rely. In the court's memorandum and order of March 30, 1972, the Government's responses were held not to be in compliance with the prior rulings of the court. Despite the court's redirection to furnish a proper bill of particulars, however, as the court has ruled today, the Government still has not complied and the delay in prosecution continues.

*Argument on Constitutional Grounds*

 In passing upon a motion seeking dismissal of an indictment for want of a speedy trial, whether the grounds be the sixth amendment's guarantee of a

speedy trial or whether it is asserted that the delay in prosecution assumes the proportions of a denial of due process under the fifth amendment, the court must examine four factors: (1) length of the delay; (2) reason for the delay; (3) prejudice to the defendant, and (4) waiver of a speedy trial. United States ex rel. Solomon v. Mancusi, 412 F.2d 88 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969); United States v. Simmons, 338 F.2d 804 (2d Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965); United States ex rel. Von Cseh v. Fay, 313 F.2d 620 (2d Cir. 1963).[11] Case law, however, also recognizes an alternative to the third part of this four-fold test. A claim of deprival of the right to a speedy trial can be sustained if the defendant can make a showing of purposeful and oppressive Government conduct as an alternative to a showing of prejudice to the defendant. See, e. g., United States v. Dooling, 406 F.2d 192 (2d Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969); United States v. Pinero, 329 F.Supp. 992 (S.D.N.Y. 1971). Thus, the defendants argue that under either version of the test adopted by the Second Circuit their motion must be granted.

### Length of Delay

The first link in the chain of illegal acts alleged by the Government in this indictment was forged in 1962 when the union's executive board created the SPAD fund. The chain of acts violating the Federal Corrupt Practices Act was completed, according to the indictment, when SPAD made contributions in 1968 to both Republican and Democratic campaign committees, with the knowledge that those funds would be used in federal election campaigns. Between 1962

and 1968 came the vast number of contributions by seamen that filled the coffers of the SPAD fund. The summer of 1968 marked the beginning of both a congressional and Justice Department investigation of SPAD operations. The congressional investigation produced no action; the Justice Department investigation, on the last day in the life of an 18-month grand jury and almost eight years after the creation of SPAD, produced this indictment. Under the test to be applied in deciding this branch of the motion, however, none of these pre-indictment events are includable in computing the length of delay. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Given the stage of the proceedings at which the defendants made their motion, only post-indictment delay is attackable.

Today, 11 days before the date set for trial, the time lapse computed from the filing of the indictment stands at almost 23 months. Clearly, while the delay here is not as shocking to the conscience as delays in some of the other cases in which similar motions have been granted, see, e. g., United States v. Mann, 291 F.Supp. 268 (S.D.N.Y. 1968) (nine-year delay), neither is the delay so minimal that the defendants' motion must be denied without considering the remaining three factors of the Second Circuit test, cf. United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969). This type of motion does not merely test the passage of time. See United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); but see United States v. Lustman, 258 F.2d 475 (2d Cir.), cert. denied 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958) (leaving open the possibility that passage of time can be a *per se*

---

11. These Second Circuit cases indicate that due to the close interrelationship between the right to a speedy trial and the right to due process the court must review the same four factors in determining whether the delay has deprived a defendant of either of the two constitutional guarantees. Unquestionably, a delay violating

the speedy trial provisions of the sixth amendment can be so prejudicial that it also violates the due process clause of the fifth amendment. See United States v. Capaldo, 402 F.2d 821 (2d Cir. 1968), cert. denied 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969).

violation of the due process clause). Accordingly, the court finds that the delay of 23 months in this prosecution is sufficiently long that, assuming the remaining factors preponderate in the defendants' favor, dismissal is warranted.

### Reasons for Delay

The Government has adopted a two-pronged position on this issue: (1) delay has not occurred and (2) if the court finds delay, then it must also find that delay is directly attributable to the actions of the defendants. Reply to Defendants' Motion to Dismiss, filed March 23, 1972, at 4. The defendants argue, however, that the delay in this prosecution has been caused by the Government's refusal to properly respond to their discovery requests. The defendants contend further that this course of conduct embarked upon by the Government has been designed by the Government to achieve a tactical advantage. Consequently, if the defendants can sustain their argument, they will not only be successful on the second part of the Second Circuit test but the third part of the alternative version as well. The court finds the defendants have sustained their argument.

From the history of these proceedings it is evident that the Government has continuously sought what it termed an early but realistic trial date. On all occasions, both this court and Judge Bartels expressed a willingness to accede to the Government's request. In fact,

in December 1971 this court set a firm date for trial—June 5, 1972. Yet, concommitant to moving a criminal cause to trial, an obligation arises on the part of the Government to forward to the defendants appropriate pretrial disclosure information.[12] With this in mind, as the minutes of the December 15, 1971 hearing attest, the court established a timetable for pretrial disclosure leading up to the June 1972 trial date. Quite simply, however, the Government has not complied with this portion of their obligation. Because of the Government's noncompliance, the defendants find themselves caught in the squeeze between early trial and adequate preparation.

The Government's failure to meet its pretrial disclosure obligations, see note 12 supra, has been a continuing one—failure to respond to the October 1970 questionnaire; failure to file a timely response to the defendants' discovery motions; failure to comply with this court's rulings on those motions. The May 1, 1972 hearing on the defendants' motion to dismiss is typical of the Government's failure to meet their pretrial obligations, e. g., in the early stages of this litigation, at the direction of the court and, at least once by request of the Government, counsel attempted through informal means to secure information the Government was obligated to give, yet, the Government, in explaining its failure to disclose any essential information until January 1972, relied on the absence of an order directing disclosure.[13]

---

12. Especially in this type of multi-defendant case alleging a continuing conspiracy that commenced almost 10 years ago, and presenting a myriad of complex legal questions and raising the spectre of vastly protracted litigation, the Government must accept its burden—narrow the triable issues and provide the defendants with essential pretrial disclosure. As Judge Marovitz noted in United States v. Tanner, 279 F.Supp. 457, 478 (N.D. Ill. 1967) (arson and bomb conspiracy):
[I]t is obvious that the Court has expended much needless time in providing particulars to the defense . . . . Even in a situation where 82 separate requests are included in a motion for a

bill of particulars, the Government has the duty to proffer those which are proper and appropriate, rather than being content to argue that the bill seeks a mass of evidentiary material, and shifting the burden to the court to sift the wheat from the chaff.

13. Mr. Brown—. . .
I would like to point out, though, that the first time that we had an order requiring the Government to produce anything was a year and a half after the indictment . . . .
Minutes of Hearing, May 1, 1972, at 42 (emphasis added).

Regardless whether the Government's all-out resistance to pretrial disclosure has exemplified good faith or bad faith, the Government has made "a deliberate choice for a supposed advantage" and the consequent delay has caused as much "damage to the defendant[s] as it would have caused if it had been made in bad faith." In re Provoo, 17 F.R.D. 183, 202 (D.Md.), aff'd per curiam, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955).

Accordingly, the court finds that the Government has chosen to embark on a course of purposeful conduct designed to secure a tactical advantage, resisting both suggestions and orders of two judges of the court to furnish the defendants with requisite pretrial disclosure while, simultaneously, demanding an early trial date. This choice of the Government seeking unfair advantage over the defendants has resulted in the current and continuing delay in the prosecution. Assuming the absence of waiver of the right to a speedy trial, then, under the alternative version of the Second Circuit test, dismissal is warranted. See United States v. Dooling, 406 F.2d 192 (2d Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969); United States v. Pinero, 329 F.Supp. 992, 994 (S.D.N.Y. 1971); cf. United States v. Blaustein, 325 F.Supp. 233, 238 (S.D.N.Y. 1971); United States v. Blanca Perez, 310 F.Supp. 550, 551 (S.D.N.Y. 1970) (prima facie prejudice).

### Prejudice

Though this court has already ruled that the Government's refusal to particularize its charges is in itself a violation of the right to a speedy trial, the court also finds the Government's failure to comply with the order to disclose information essential to the defense has seriously prejudiced the defendants' ability to prepare to meet the charges lodged against them. Because of the Government's failure to disclose this essential information, the defendants will be unable to investigate adequately the transactions concerning which the Government has indicated its intent to offer evidence on trial. Absent such investigation, the defendants will be prevented from effectively cross-examining the Government's witnesses, nor will they be able to locate, interview and procure the attendance at trial of any rebuttal witnesses who might have a recollection of these events.[14] Similarly, despite an order by this court to do so, the refusal of the Government to particularize fully its position with respect to the organization and composition of the SPAD fund has rendered impossible any statistical defense to the charges lodged against these defendants.

Further, the defendants set forth the sudden and unexpected death on January 26, 1972 of defendant Al Kerr as a specific example of prejudice resulting from the delay in prosecution. Defendant Kerr, the sole individual named in the substantive counts of the indictment and termed in the Government's bill of particulars as the "general administrator for the Union in all matters concerning SPAD," was the custodian of all SPAD records and reports. Assuming defendant Kerr took the stand, and there is no reason to believe at this time that he would not have taken the stand, he would have been in a position to testify as to the facts concerning SPAD's creation; the existence of SPAD as an entity distinct from the union; the efforts of the defendants beginning in 1962 and continuing to the present to comply with the requirements of the Federal Corrupt Practices Act, as well as to rebut the Government's allegations to the

---

14. The prejudice flowing from the Government's failure to provide this information is magnified in this type of case where the issues to be resolved require an inquiry into the state of a person's mind —both of the contributing seaman and the collecting union official. See Minutes of Hearing, May 14, 1971, at 10. Moreover, the problem is greatly exacerbated by the absence of the defendants from any transaction upon which the Government intends to rely that resulted in a contribution to the SPAD fund.

contrary. Clearly, defendant Kerr was the one individual most qualified to testify as to SPAD's organizational structure and daily operation, and to distinguish the interrelationships among the individual defendants, the union, SPAD and the alleged co-conspirators. More importantly, the defendants aver that defendant Kerr personally made refunds to all SPAD contributors who requested them. Such testimony as to SPAD's custom and practice of giving refunds, in addition to specific evidence as to the time, place and manner in which these refunds were made is vital to the defense. By the death of this specific favorable witness, Al Kerr, however, not only have the defendants lost all of his vital testimony at trial, but they also have lost his invaluable aid in preparation before trial.

Moreover, the defendants alleged prejudice in an area not directly related to trial preparation or the loss of evidence. In addition to alleging the presence of anxiety that accompanies the prospect of criminal trial and which becomes "manifestly oppressive" when post-indictment delay increases "from months to years," see United States v. Blanca Perez, 310 F.Supp. 550, 551 (S.D.N.Y. 1970); see also United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the defendants allege further that they "have been substantially disabled from properly fulfilling their functions as a labor organization and as officials of that organization." Supplemental Affidavit in Support of Motion to Dismiss, filed April 28, 1972, at 17–18.[15] Furthermore, the defendants point out, bail limitations have reduced the ability of the individual defendants to perform various services in behalf of the union and its membership.

From this recital of facts prejudice is readily apparent. A key witness, Al Kerr, critical to the defense has become unavailable through death. Dickey v. Florida, 398 U.S. 30, 36, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1969). Defendant Kerr's death, coming almost on the heels of the Government's initial pretrial disclosure, coupled with the Government's continuing failure to disclose other essential information, has hampered the preparation of a defense in this case. United States v. DeMasi, 445 F.2d 251, 255 (2d Cir.), cert. denied, 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971). Moreover, there is a suggestion in the record that potential witnesses are unable to recall some of the events that have occurred in the last ten years, eight of which are covered in this indictment. *Id.* Thus, especially in light of the death of Al Kerr, it can be fairly said on this record that "the search for truth has been severely hampered" and, rather than being a case where possible prejudice is "unsubstantial, speculative and premature," this is a case where prejudice is actual and has been particularized. United States v. Mann, 291 F.Supp. 268, 271 (S.D.N.Y. 1968).

### *Waiver*

■ Ordinarily, a defendant waives his right to complain of the want of a speedy trial if he fails to move for a speedy trial. See, e. g., United States v. Lustman, 258 F.2d 475 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958). Nonetheless, as this court indicated in its Memorandum and Order, filed March 30, 1972, at 5,

15. The defendants argue that the pendency of these charges has adversely affected the union's organizational activities and have effectively barred the union from functioning in the political arena. Of course any arrest and indictment leaves the defendant open to "public obloquy," to a drain on his financial resources and a curtailment of his associations, United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) ; here, however, the problem has been exacerbated by delay. Defendant Paul Hall, particularly, who has been named in the press as a probable successor to George Meany as President of the AFL–CIO, see Supplemental Affidavit in Support of Motion to Dismiss, filed April 28, 1972, Exhibit "C," has suffered greatly from the public notoriety surrounding this prosecution.

an exception to the waiver rule exists when because of the Government's conduct, a defendant's demand for a speedy trial cannot be an effective remedy. See In re Provoo, 17 F.R.D. 183 (D.Md.), aff'd per curiam, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955). As the court has found, *supra*, the Government has failed to file an adequate bill of particulars as ordered by the court. In fact, this failure continues even today.

■ Since the burden is with the prosecution to move this case forward, see Dickey v. Florida, 398 U.S. 30, 37–38, 90 S.Ct. 1564, 26 L.Ed.2d 26, the failure of the defendants to demand a speedy trial cannot be deemed a waiver of their rights when the Government, at the same time, has failed to comply adequately with an order to file a bill of particulars and has, thus, failed to move the case to trial. United States v. Blaustein, 325 F.Supp. 233, 237–240 (S.D. N.Y. 1970); United States v. Chin, 306 F.Supp. 397, 400 (S.D.N.Y. 1969). Therefore, the court finds that the defendants have not waived their rights to complain of the lack of a speedy trial.

Consequently, since the court has found in favor of the defendants on each of the four factors involved in the Second Circuit test, the defendants' motion to dismiss on constitutional grounds must be granted.

### Rule 48(b)

■ Rule 48(b), Fed.R.Crim.P., provides in pertinent part:

If there is unnecessary delay . . . in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

The defendants proffer this rule as an additional ground for dismissal.

■ The rule has been held to implement the sixth amendment's guarantee of a right to a speedy trial. Pollard v. United States, 352 U.S. 354, 361 n. 7, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Before the rule can be invoked, however, the defendants must make a successful showing of delay and either that it prejudiced the defendant's ability to rebut the Government's case or that it was caused by oppressive governmental action. United States v. Dooling, 406 F.2d 192, 196 (2d Cir.), cert. denied, 395 U.S. 911, 89 S.Ct. 1742, 3 L.Ed.2d 224 (1969). But, in any case, a motion under this rule is addressed to the sound discretion of the court. See, e. g., United States v. Research Foundation, Inc., 155 F.Supp. 650, 654 (S.D.N.Y. 1957). Here, the court has found delay resulting from purposeful conduct of the Government that has prejudiced the defendants' ability to rebut the case the Government seeks to prove against them. Hence, the court, in its discretion under rule 48(b), must again find in the defendants' favor.[16]

### Individual Defendants

Counsel for the defendants Paul Hall and Earl Shepard urge dismissal on an additional ground—union officials should not be vicariously liable for any unlawful acts of the union committed by other union officials or union employees that were unauthorized by or unknown to them. Even assuming this to be the law, it would not of itself entitle these defendants to a dismissal at this time. At best, in light of the conspiracy count in the indictment, the defendants could

16. The defendants also seek dismissal under rights secured to them by the Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (January 5, 1971, as amended, May 24, 1971) These rules were promulgated by the Circuit Council in the exercise of its supervisory power over the administration of justice in the federal courts of the Second Circuit. But, since the rules were designed as a housekeeping tool to insure the swift and efficient administration of justice and in light of this court's finding of a violation of the substantive rights secured to the defendants under both the Constitution and the Federal Rules of Criminal Procedure, it becomes unnecessary to rule upon that part of the defendants' motion grounded on the Second Circuit rules. The court, therefore, refrains from rendering such an opinion.

**792**

have raised this argument at the close of the Government's case. Now, however, a motion on this ground must be denied.[17]

As to another individual defendant, Al Kerr, quite obviously, an additional ground for dismissal exists—his sudden and unexpected death. For all the reasons stated previously and on this ground as well, the indictment against defendant Al Kerr must be dismissed.

### Conclusion

The defendants' motion to dismiss is granted. The indictment is dismissed as to all defendants and all defendants are discharged.

So ordered.

---

17. Insofar as the defendants Hall and Shepard object that the charges against them have not been sufficiently particularized, they are situated similarly to the other individual defendants. As to all the individual defendants, however, the court has already noted their trial preparation problems have been greatly exacerbated by their lack of knowledge concerning the daily operations of SPAD and of the transactions underlying contributions to the SPAD fund.