**UNITED STATES of America,
Appellee,**

**v.**

**PUI KAN LAM et al., Appellants.**

**Nos. 888, 889, Dockets 73–1150, 73–1270.**

United States Court of Appeals,
Second Circuit.

Argued May 23, 1973.

Decided Aug. 21, 1973.

Alan Scribner, New York City (Albert J. Krieger and Ivan S. Fisher, New York City, on the brief), for appellants Wai Kwon Yip and Wai Kwok Yip.

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City, of counsel), for appellant Pui Kan Lam.

Charles H. Fier, Brooklyn, N. Y., for appellant Pui Leung Lam.

L. Kevin Sheridan, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. for the E. D. of New York, and Robert L. Clarey, Asst. U. S. Atty., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and KILKENNY* and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Following a two-week trial before the late Hon. George Rosling and a jury in the Eastern District of New York, appellants Pui Kan Lam ("Kan Lam"), Pui Leung Lam ("Leung Lam"), Wai Kwok Yip ("Kwok Yip") and Wai Kwon Yip ("Kwon Yip") were found guilty on one count of possessing with intent to distribute approximately three pounds of heroin. 21 U.S.C. § 841(a)(1).[1] On this appeal all appellants claim that an electronic interception of a conversation between appellants Kan Lam and Kwok Yip was illegal and that a tape record-ing of that conversation was erroneously admitted into evidence during the Government's rebuttal case. Additionally, appellant Leung Lam challenges the sufficiency of the evidence supporting his conviction. We reject all contentions of error and affirm the convictions.

The electronic interception occurred at Apartment 1F in a small building, 43–24 42nd Street, located in Queens, New York. Apartment 1F had been occupied by two males of Oriental extraction who were unrelated to appellants and who had been arrested on heroin importation charges in January, 1972. On June 26, 1972, the wife of the superintendent of 43–24 42nd Street called Customs agents (with whom she had become acquainted during the January investigation) to report that several young males, likewise of Oriental extraction, were attempting to gain entrance to Apartment 1F.

Suspicions aroused, Customs agents visited the building, informed the tenants of Apartment 1F of the narcotics-related history of the apartment, and obtained "free access" to it, including a consent to search it and to "do anything they want[ed] to." From the occupant of the apartment over 1F, the agents were told of hammering noises coming from the back wall of the bedroom heard during Christmas week, 1971. The tenants of 1F were instructed that in the event the men came back seeking access to the apartment they should be told the apartment belonged to a mythical uncle and that they should return the following day between noon and 1:00 p.m. when the uncle would be there.

As luck would have it, the four Oriental visitors appeared late that very night. One of them said that the four were the former occupants of 1F and wished to retrieve "immigration papers" left in the apartment. The prearranged story was recited, the night visitors de-

* Of the Ninth Circuit Court of Appeals, sitting by designation.

1. The appellants Lam were each sentenced to a term of ten years' imprisonment and five years' special parole, sentences they are presently serving. The appellants Yip were each sentenced to five years' imprisonment and five years' special parole. They are free on bail pending this appeal.

parted, and Customs was called. A neighbor in the building noted the license plate number of the visitors' car and a check revealed that it was registered to the father of appellants Yip.

The next morning the agents were admitted to 1F after the tenants had left. A search revealed approximately three pounds of heroin stashed behind a bedroom baseboard. The agents dusted the heroin bags with fluorescent powder so as to leave a residue on the hands of anyone touching them.

The agents placed a transmitting "bug" beneath a mattress in the 1F bedroom and receiving equipment in the superintendent's apartment. They had received no prior judicial approval for these actions.

At approximately noon on the 27th the surveilling agents spotted the Yip car containing four occupants. After a stop at a nearby restaurant the four occupants walked toward the apartment. Two, Kwok Yip and Kan Lam, went into a store to purchase a screwdriver and a shopping bag, while the others waited outside. The appellants then divided up, with three heading for 43–24 42nd Street and Leung Lam (whose contentions of insufficiency of the evidence will be discussed *infra*) walking alone in the same general direction.

The Yips and Kan Lam were admitted to Apartment 1F by a Customs agent posing as a superintendent's helper. From a peephole in the superintendent's apartment and the receiving equipment placed therein the agents monitored the three appellants' activities. Kwon Yip left Apartment 1F almost immediately after entry. The monitoring equipment then picked up a conversation in Chinese (which the agents did not understand) and some ripping noises. Shortly thereafter, the two remaining appellants, Kwok Yip and Kan Lam, emerged from 1F and were arrested. Kwon Yip was carrying a shopping bag which contained the heroin packages dusted by the agents. Leung Lam was also arrested. Illuminatingly, on subsequent examina-

tion the hands of Kan Lam revealed traces of fluorescent powder.

Appellants' defense was that they intended to retrieve money hidden in 1F, not heroin. Kan Lam testified that he was told of the hidden money by a somewhat mysterious "Chang" during a Chinatown conversation and was also shown a map of Queens indicating 43–24 42nd Street's location. At the time, however, Kan Lam dismissed the whole affair as a "joke." Later he claimed to have changed his mind and recruited Kwok Yip (who had access to a car) to help recover the "money." According to Kan Lam, only Kwok Yip was told of the purpose of the several trips to Queens taken by appellants; the others were taken "along for the ride." It suffices here to say that the other appellants testified along the same general lines.

After all the appellants had testified the Government introduced in rebuttal, through the testimony of a Customs agent and a Chinese interpreter, a transcript of that part of the intercepted conversation that was translatable and played the whole tape for the jury. The actual conversation introduced contained no specific references to heroin but does demonstrate that two men were engaged in conversation while the baseboard was being ripped off. This contradicted Kwok Yip's testimony on direct examination that immediately after entry he went into Apartment 1F's bathroom and remained there until after Kan Lam removed the baseboard. The final sentence of the translated transcript of the intercepted conversation introduced was: "Next time it's better to go out from here." According to appellant Kan Lam, that sentence "impli[ed] that the activities of the defendants involved other and similar activities which would be going on in the future" and "undercut the joint defense, which was that the entry into the apartment was a one-time event for the purpose of getting $30,000."

All appellants contend in varying ways that the warrantless interception of the conversation in 1F was illegal un-

der the federal statute regulating such matters, 18 U.S.C. § 2510 et seq., and the fourth amendment. Appellants' argument of illegality is premised on the fact that there was no "consent" to the interception by one of the parties to the conversation[2] which, under the statute, 18 U.S.C. § 2511(2)(c), is the only applicable exception to the general warrant requirement. Appellants Yip, and apparently appellant Leung Lam, argue that the interception was the principal basis for the probable cause necessary to justify the arrest of appellant Kwon Yip and the resulting seizure of the heroin. Since the interception was illegal, the argument runs, so was the seizure. All appellants additionally argue that the introduction of the tape recording in the Government's rebuttal case prejudiced them in the ways described above.

■ At the threshold, appellants Kwon Yip and Leung Lam, who were not at 1F at the time of the allegedly illegal interception, lack standing to challenge it under either the constitutional, see, e. g., Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208

(1973), or statutory standard. 18 U.S.C. § 2510(11).[3] To establish standing these appellants must show not that damaging evidence was introduced against them but rather that their personal rights were violated by the allegedly illegal interception. "Coconspirators and codefendants have been accorded no special standing," Alderman v. United States, 394 U.S. 165, 172, 89 S. Ct. 961, 965, 22 L.Ed.2d 176 (1969), in this regard. See United States v. San Martin, 469 F.2d 5, 8 (2d Cir. 1972). Since appellants Kwon Yip and Leung Lam were not in Apartment 1F during the intercepted conversation, they had no legitimate interest in protecting the privacy of the intercepted conversation. They also had no interest in protecting the privacy of the premises for they had no possessory interest in them. See Brown v. United States, supra, 411 U.S. at 223, 93 S.Ct. 1565; cf. Alderman v. United States, supra, 394 U.S. at 176–180, 89 S.Ct. 961.[4]

Appellants Kan Lam and Kwok Yip, however, are rightfully conceded by the Government to have the necessary stand-

2. The Government does not contend here, as it apparently did below, that the consent by the tenants to "do anything they want[ed] to" in Apartment 1F satisfied the statutory requirement of consent by "one of the parties to the communication." 18 U.S.C. § 2511(2)(c). See United States v. San Martin, 469 F.2d 5, 7 (2d Cir. 1972) (dictum).

3. 18 U.S.C. § 2510(11) provides:
"[A]ggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.

4. The rationale of the only case cited by appellants Kwon Yip and Leung Lam to support their standing, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960), has been questioned in the recent Brown v. United States, 223 U.S. 411, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). The Jones concept of "automatic standing" to contest an allegedly illegal search and seizure where, as here, the same possession needed to establish standing is "an essential element of the offense with which the defendant is

charged," Simmons v. United States, 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L. Ed.2d 1247 (1968), is thus of dubious vitality. But we need not and do not decide what is left of Jones after Brown, for the rationale of Jones is simply inapplicable to this case, as it was to the case presented to the Court in Brown. The Jones Court conferred "automatic standing" on the petitioner there because it was "not consonant with the amenities, to put it mildly, of the administration of criminal justice," 362 U.S. at 263, 80 S. Ct. at 732, to require a defendant to affirm possession of contraband for purposes of establishing standing to challenge an illegal search and seizure and later to require him to deny it at trial of guilt or innocence. Here, there is no conflict with such "amenities," as appellants do not contest their actual or constructive possession of the narcotics, only their knowledge of what they were possessing. Thus, the Jones rationale is plainly inapposite here and appellants Kwon Yip and Leung Lam have no other basis to establish standing to challenge the legality of the interception.

ing since it was their conversation that was intercepted. Their claim of illegality is nonetheless rejected, because the conversation between them did not occur in a factual setting which legally justified any subjective expectation of privacy they may have had. As a result it was neither an "oral communication" within the meaning of the statute, 18 U.S.C. § 2510(2),[5] nor entitled to constitutional protection against the "uninvited ear." Katz v. United States, 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■■ As we have been advised, "the Fourth Amendment protects people, not places," Katz v. United States, *supra*, 389 U.S. at 351, 88 S.Ct. at 511, and the statutory definition of an "oral communication" tracks this constitutional concept.[6] The question we have before us is whether the subjective expectation of privacy violated by the allegedly illegal intrusion is one society is prepared to recognize as " 'justifiable.' " United States v. White, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion). *See* Katz v. United States, *supra*, 389 U.S. at 352, 353, 88 S.Ct. at 511–512 (majority opinion) and at 360–362, 88 S.Ct. at 516–517 (concurring opinion of Harlan, J.). Measured by this objective standard appellants' expectations must fail. The interception here did not occur in a public phone booth, Katz v. United States, *supra*; a suspect's home, Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); or office, Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); or the home of a friend into which appellants had been invited. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Rather it occurred in the house of complete strangers to which appellants had made

several suspicious visits and into which they tried to gain entry by false representations, which alone would seem sufficient to deny them any expectation of privacy. Further, appellants were granted entry into the house by a "superintendent's helper" who then departed and left them alone. Under the circumstances appellants may be held to have assumed that their activities might be monitored. *Cf.* People v. Santos, 26 Cal.App.3d 397, 102 Cal.Rptr. 678 (Ct. App.2d Dist. 1972) (interception of conversation between husband and wife over jail intercom telephone not interception of an "oral communication" within statute in part because an expectation of privacy under the circumstances would not have been reasonable). There is no danger here that upholding the interception will "smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse —that liberates daily life." United States v. White, *supra*, 401 U.S. at 787, 91 S.Ct. at 1144 (Harlan, J., dissenting). For "daily life" does not include conversation in the apartment of strangers under the circumstances preceding the entry here.

■ Additionally, in delineating the scope of the statutory and constitutional protections, the value of the law enforcement activity, *see* White v. United States, *supra*, 401 U.S. at 786, 91 S.Ct. 1122 (Harlan, J., dissenting), as well as the officers' reasons for not obtaining a warrant, *cf.* Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971), should also be considered. The value of the interception here is obvious, since it enabled relevant evidence against appellants to be gathered that could be obtained by no other means. The reason for not securing a warrant was simply, and justifiably, the

---

5. 18 U.S.C. § 2510(2) defines an "oral communication" as:

"[O]ral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . .

6. In contrast, the statutory definition of "wire communication," the interception of which is also prohibited, contains no "justified" expectation of privacy requirement. *See* United States v. Carroll, 332 F.Supp. 1299, 1301 (D.D.C.1971).

pressure of time. The officers did not even enter the apartment until approximately 9:30 a.m., after the tenants had left for work. They did not discover the heroin until sometime thereafter, approximately 10:30 a.m. According to the prearranged story planted by the tenants the Oriental visitors were to return to the apartment by noon that day and could have arrived even earlier. The agents scarcely had enough time to call for and install their equipment and organize their surveillance, let alone obtain a warrant.

Having held that appellants either have no standing to bring this challenge or are not protected by the statute or constitution, there is no need to pass on the further questions whether, absent the interception, there was probable cause to arrest Kwon Yip and seize the shopping bag containing the heroin packages; whether the transcript and tape recording of the intercepted conversation were properly introduced against appellant Kwok Yip for impeachment purposes; and whether, even if the interception was illegal, the admission of the transcript and tape recording was harmless error. We affirm the convictions of appellants Kan Lam, Kwok Yip and Kwon Yip and go on to consider the sufficiency of the evidence against appellant Leung Lam.

 Leung Lam is Kan Lam's older brother and came to the United States from Hong Kong in 1968. He had worked as a merchant seaman and in the clothing industry in Hong Kong. Since his arrival in New York Leung Lam worked steadily at various jobs in the garment industry and eventually acquired ownership interests in two sportswear companies. He does not speak, read or understand English.

The evidence of Leung's involvement in this case, viewed in the light most favorable to the Government, was as follows: although appellant testified he accompanied the other appellants to Queens only on June 26 and June 27, 1972, there was evidence from which the

jury could have inferred that he also accompanied them there on at least one other occasion and perhaps other times. Even one prior visit was inconsistent with Leung Lam's defense, that he was just wandering around while the others had gone to "look for a friend."

On the day of appellant's arrest, June 27, Leung Lam entered the Queens restaurant with the other appellants. After leaving the restaurant, all appellants walked east on Queens Boulevard toward 43-24 42nd Street. Leung Lam waited outside with Kwon Yip while the other appellants entered the store to purchase a screwdriver and shopping bag.

The business at the store complete, all four appellants walked east on Queens Boulevard to the corner of Queens Boulevard and 42nd Street. Kwok Yip, Kwon Yip and Kan Lam then turned north and proceeded toward the apartment house up 42nd Street on the west side of the street. Leung Lam crossed to the east side of 42nd Street but also proceeded north toward the apartment building.

The Customs agent who followed Leung Lam testified that while proceeding toward the apartment building Leung Lam frequently stopped and looked around. Still looking around, Leung Lam walked past the subject apartment building, crossed 43rd Avenue (which runs parallel to Queens Boulevard), then crossed 42nd Street and recrossed 43rd Avenue. He then proceeded past the apartment house on the west side of 42nd Street. It was here he was arrested, shortly after Kwon Yip had left the immediate vicinity of the apartment building with the shopping bag containing the heroin. At the time of arrest, Leung Lam was walking towards Queens Boulevard, about 45 feet behind Kwon Yip, toward the parked Yip car.

Leung Lam's testimony in his own behalf was that he did not know anything about the purpose of the various trips to Queens and that he went along solely to see a movie and get a bite to eat. He claimed to have heard no conversation in

the car about the purpose of the trips. The only business he ever discussed with the Yips was the possibility of financing a Chinese restaurant in which the Yips would be employed. According to Leung Lam, after the other appellants had told him they were leaving to "meet a friend," he entered a store to buy some yarn but needed an interpreter to negotiate the purchase and therefore left the store to look for the other appellants. He was doing that, he said, just before his arrest.

The jury could find, however, that Leung Lam acted as a lookout for the group and did not innocently go along with the others "just for the ride." While the evidence against appellant was entirely circumstantial, *see* United States v. Taylor, 464 F.2d 240, 244 (2d Cir. 1972), and less than overwhelming, we cannot conclude it was insufficient as a matter of law. Leung Lam followed the appellants toward the apartment on the opposite side of the street. The testimony of the surveilling agents disputed his testimony that he entered a store to shop for yarn. According to the agents he never lost sight of the others until they entered the apartment building. He admitted on cross-examination[7] that he made purchases alone in non-Chinese stores "many times" and that he could read Arabic price tags on merchandise. Given that admission, and the agent's testimony, the jury could rationally discredit entirely Leung Lam's story that at the time of arrest he was wandering on the street seeking an interpreter to help him negotiate a purchase of yarn. The jury could thus interpret appellant's conduct as indicating "concer[n] about possible police surveillance or interference from innocent passers-by," United States v. Carneglia, 468 F.2d 1084, 1088 (2d Cir. 1972), and not as the conduct of an innocent caught in a police dragnet.

As a matter of common sense, the jury was entitled to take into account what appears to us an incredibility inherent in Leung Lam's story. United States v. Arcuri, 405 F.2d 691, 695 (2d Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969). It is a little difficult to believe that a man of some sophistication and business success within the Chinese community would take at least two trips to an unknown location in Queens without inquiring or hearing anything about the purpose of the trips (which happened to result in his younger brother and two friends acquiring a cache of heroin). There was no language barrier in his communications with the other appellants that prevented such an inquiry. Further, there is the fact that far from being the most docile member of the group, Leung Lam provided virtually all support for his younger brother and had proposed a restaurant venture in which he would be "the boss" of the Yips. *Cf.* Nye & Nissen Corp. v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Fried, 464 F.2d 983, 985 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 554, 34 L.Ed.2d 511 (1972). This role as provider and proposer is hardly consistent with his claim of passive association with the narcotics recovery operation. Rather, Leung Lam's isolation from contact with the apartment could rationally be viewed by the jury as an effort to insulate himself from criminal liability, to put himself in the position of a manipulative leader rather than an unwitting innocent. Such inferences are for juries to draw and we will not disturb them on appeal, at least where, as here, there was a fair aiding and abetting charge. *See* United States v. Infanti, 474 F.2d 522, 526 (2d Cir. 1972); United States v. Fried, *supra,* 464 F.2d at 985.

Judgments affirmed.

---

7. Once a defendant offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief, of course, the defendant waives any claim as to the sufficiency of the Government's case considered alone. United States v. Arcuri, 405 F.2d 691, 695 n. 7 (2d Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969).