UNITED STATES of America,
Plaintiff,

v.

Dennis BANKS, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Russell MEANS, Defendant.

Nos. Cr. 73–5034, Cr. 73–5062, Cr. 73–5035
and Cr. 73–5063.

United States District Court,
D. South Dakota, W. D.

April 30, 1974.

See also D.C. 368 F.Supp. 1245.

William F. Clayton, U. S. Dist. Atty., for the District of South Dakota, and R. D. Hurd and David R. Gienapp, Asst. U. S. Attys., Sioux Falls, S. D. and Earl Kaplan, Dept. of Justice, Washington, D. C., appeared in behalf of the plaintiff.

Mark Lane, New York City, Douglas Hall and Larry B. Leventhal, Minneapolis, Minn. and Ramon A. Roubideaux, Rapid City, S. D., appeared in behalf of the defendant Banks.

William M. Kunstler, New York City, and Kenneth E. Tilsen, St. Paul, Minn., appeared in behalf of the defendant Means.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

In this case, stemming from the 71 day siege/occupation of the hamlet of Wounded Knee, South Dakota, an extended adversary hearing was held, pursuant to the requirements of Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), to determine whether this case should be dismissed on the basis of governmental misconduct. The motion propounds four basic charges: (1) the alleged illegal interception of wire communications from Wounded Knee through use of a party line at roadblock one; (2) the alleged

failure of the government to comply fully with the discovery order; (3) the alleged interference by the government with confidential attorney-client relationships through the interception of attorney-client conversations on the party-line telephone, and (4) the alleged general government dishonesty and misconduct.

██ It requires no citation of authority to conclude that dismissal of a criminal prosecution should be the last resort of the trial judge who is attempting to remedy the prejudicial effects of alleged governmental wiretapping and misconduct. Accused individuals must be brought to trial or our institutions for the maintenance of societal order will collapse. It is only when a court can conclude that it is powerless to provide a criminal defendant with a fair trial, now or at any time in the reasonable future, should the court dismiss the case. With those prefatory observations in mind, I pass to an analysis of the four areas outlined above.

## POINT I—ILLEGAL INTERCEPTION OF WIRE COMMUNICATION

Throughout the hearing, there has been a great deal of contradiction and confusion regarding the facts, but certain agreement has emerged on the following.

On March 5, 1973, M. Joe Pourier, employee of the Bison State Telephone Company, at the direction of then deputy marshal Tommy Hudson, installed three telephones on one line leading from Pine Ridge, South Dakota, into Wounded Knee. Two of these phones (with one number) were placed in the Trading Post at Wounded Knee and the third (with a different number but on the same party line as the other two) was installed at a position outside of Wounded Knee known at that time as Government roadblock one.

The phones were operable between March 5, 1973, and April 6th, or possibly April 13, 1973 (for the roadblock phone), and between March 5, 1973, and April 9, 1973 (for the Trading Post phone), with certain periods of service disruption when lines were out or there was some trouble on the lines. While it was functioning, the roadblock phone was monitored several times and conversations emanating from Wounded Knee were overheard by at least six different FBI agents: Bertinot, Hemmert, Roley, Dick, Harvey and Samuels. Other agents knew such monitoring had taken place and include Trimbach, Hoxie, Sanders, and possibly Chaney.

On March 13, 1973, FBI special agent Thomas Parker transmitted to the Justice Department in Washington, D.C., a wiretap application and affidavit under Title III of the Omnibus Crime Control Act, 18 U.S.C. 2510 et seq., in connection with the telephone at Wounded Knee. Said application was never approved by the Attorney General. The Trading Post phone was disconnected either April 6, 1973, or April 13, 1973.

A. *Applicability of 18 U.S.C. Secs. 2510–2520—Whether roadblock phone was installed and used in the ordinary course of business.*

In its brief, the government argues that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Secs. 2510–2520, has no application to the alleged interception because the telephone connection at roadblock one was for the purpose of furnishing service " . . . to the subscriber or user . . . in the ordinary course of business . . . .[1] The following discussion shows the facts to be otherwise.

---

1. 18 U.S.C. Sec. 2510(5) states as follows: "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than—
(a) any telephone or telegraph instrument, equipment, or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber in the ordinary course of its business. . . .

1. *Those in Wounded Knee were not informed of the phone at roadblock one.*

M. Joe Pourier, the employee of the Bison State Telephone Company who installed both the Wounded Knee phones and the roadblock phone on March 5, 1973, testified that when he installs a party-line telephone in his work, he customarily tells a subscriber that it is a party-line hookup. In this case, however, he could not be sure whether he told anyone at the Wounded Knee Trading Post that he was installing a party-line since the government was the subscriber that was going to pay for the use of the telephone, not the occupants of the Trading Post. Clyde Bellecourt testified that he was with Mr. Pourier during the entire time that Pourier installed the phone at the Trading Post. He stated that Pourier never told him or anyone else in his presence that the telephone was a party line or that there was going to be an extension to that phone at roadblock one. Government witness Thomas Nelson also testified that he told no one in the Trading Post about the existence of an extension or party-line phone on the same line at roadblock one.

Ramon Roubideaux and Mark Lane, attorneys for the defendants, both of whom were inside Wounded Knee during the siege/occupation, testified that they knew nothing about the party-line to the Trading Post phone which was located at roadblock one. Indeed, chief government negotiator Kent Frizzell knew nothing of the existence of the roadblock phone when he assured Mr. Lane that the phones at the Trading Post were not tapped. (While it is true that such assurances were probably made after the roadblock phone had been disconnected, Mr. Frizzell had not known that there was ever a telephone at roadblock one).

2. *Installation for purpose of negotiation.*

Mr. Pourier also testified that he was asked to install the phones at the Trading Post and roadblock one by United States Deputy Marshal Tommy Hudson who requested that the phones be put on the same pair of wires in order to facilitate negotiations between the occupiers of Wounded Knee and those government officials manning the roadblock, including the Community Relations Service people from the Justice Department, the FBI, and others. Hudson had received such instructions from his Director, Mr. Colburn, Tommy Nelson, the BIA electrician who helped Pourier with the installations, also testified that he had been told by Pourier that the phones were being installed for negotiating purposes.

Further testimony as to the negotiating purpose behind the roadblock phone installation was given by FBI agents Hoxie and Samuels. Samuels explained that it was his understanding that the phone was at roadblock one to permit communication in an emergency situation between the roadblock and the occupants of Wounded Knee or between the roadblock and the Command Post headquarters of the FBI in Pine Ridge. Strangely, however, both Hoxie and Samuels agreed the phone was useless for their purposes because it was a party line, and both admitted they did not know the special dialing procedure necessary to communicate with the other party line number at the Trading Post inside Wounded Knee.

Contrary to the foregoing testimony declaring negotiation to be the purpose of the telephone installation at roadblock one, FBI special agent Thomas Parker, in his teletyped answer to an FBI request for information as to who had used the phone at roadblock one, stated that because of the poor radio communications maintained between the Pine Ridge Command Post and roadblock one, the phone was installed to facilitate communications between those two points. This would partially coincide with agent Samuels' testimony, although no mention was made by agent Parker of any negotiation purpose served by the roadblock telephone until he testified in court at a later time, claiming that his memory

had been refreshed as to the purpose of the phone installation.

Several of the FBI agents who actually overheard conversations on the roadblock phone never heard of its being installed or used for negotiation or any other purpose other than monitoring. These include agents Bertinot, Roley (Malone), Sanders, Dick and Harvey, none of whom knew the complicated dialing procedure for reaching the Trading Post.

Further evidence militating against any actual purpose of negotiation behind installation of the phone was brought out by testimony of defense attorney Roubideaux. Mr. Roubideaux stated that his understanding of the reason behind putting a telephone inside Wounded Knee was not to negotiate but to enable those inside Wounded Knee to contact their attorneys, but he did not know of the existence of the roadblock phone. It seems unbelievable indeed that if the intent were to facilitate negotiations between those at the Trading Post and those at roadblock one, that neither the defendants' attorney nor the government's chief negotiator knew about it.

3. *Actual Use of Roadblock Phone.* Despite such testimony proclaiming the various purposes behind the installation, the glaring truth is that there was absolutely no evidence that the telephone at roadblock one was *actually used* for either negotiation with the occupiers of Wounded Knee, or for communication with the FBI command post. Indeed, how could it have been used to contact Wounded Knee when no one who knew of the existence of the phone (other than the installers) knew how to dial the Trading Post number? Any desired contact among the above three points was invariably made by radio. In fact, except for special agent Roley's one unsuccessful attempt to use the phone to order supplies (she heard voices and hung up), the only use made of the telephone at roadblock one was by FBI agents monitoring conversations of the individuals at Wounded Knee. An in-

court admission was made by government attorney R. D. Hurd that the roadblock phone was essentially useless for anything other than overhearing because of the heavy use by the people inside Wounded Knee of the Trading Post phone which was on the same party line.

The strongest and most convincing evidence of interception via the roadblock telephone came from the FBI special agents themselves. Those who served at roadblock one and who used the phone, used it for one purpose only—to monitor conversations coming from the Wounded Knee Trading Post. There was not one instance shown where the phone was actually used to communicate with those inside Wounded Knee or to communicate with the Command Post.

4. *Indications that the government itself realized the monitoring was improper.*

Evidence was presented that at least one of those FBI agents on duty during the siege/occupation had an indication that any monitoring of the phone would be improper. Special agent Tom Parker testified that while he did not know if monitoring the roadblock phone would have been illegal, it must have crossed his mind. He said this because on or about March 8, 1973, agent Parker gave instructions at a briefing for approximately 20–50 FBI agents that "no agents should use that phone for monitoring" because "I didn't want any accusations of illegal monitoring." (Again, it seems strange that none of the agents who were at the roadblock and were questioned during the hearing acknowledged receiving such instructions). It was after giving these instructions that agent Parker prepared a wiretap affidavit in an attempt to obtain a wiretap authorization. The sequence of Parker's actions leads quite clearly to the conclusion that Parker was at least instinctively aware that monitoring by the FBI without legal authorization would be improper and illegal.

Agent Parker was not alone in his misgivings. In an affidavit, Henry Pe-

tersen, Assistant Attorney General for the Criminal Division of the Justice Department, stated that at the time the wiretap application for Wounded Knee reached him, he expressed concern that the probable cause for and justification of Parker's application might be based on information obtained from illegal eavesdropping.

Since the application was either turned down or withdrawn, there is no need to determine whether any such monitoring was a basis for the Title III application. The relevant fact here is that Petersen's knowledge that federal agents might have listened in on party-line conversations "raised questions" in his mind as to whether such party-line eavesdropping was legal. One must remember such doubts were raised even when Petersen thought the line was an 8 to 10 party line. His doubts would have been overwhelmingly confirmed if he had been aware of all the evidence brought out by the adversary hearing.

### ■ 5. *Conclusions*

This court concludes that the sole use made of the party-line phone at roadblock one was for intercepting or monitoring wire communications coming out of Wounded Knee, and that the phone served no legitimate purpose. A telephone used solely for such monitoring cannot be said to fall within the exclusion in 18 U.S.C. Sec. 2510(5)(a) of "[a] telephone . . . (i) furnished to a subscriber . . . in the ordinary course of its business *and being used* by the subscriber in the ordinary course of its business. . . ." This was not the case of a regularly installed party-line telephone in normal use. Indeed, no normal use was ever made of the phone in question. This court therefore holds that the use of the telephone at roadblock one falls directly within the prohibitions of the statute and constitutes an illegal interception of a wire communication under 18 U.S.C. Sec. 2511 and 18 U.S.C. Sec. 2510(4), (5).

Although there seem to be no cases directly on point, Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968), has similarities, the relevance of which are not destroyed by the fact that the decision in *Lee* was based on 47 U.S.C. Sec. 605, a section of the Federal Communications Act which prohibits unlawful interceptions and divulgence of a wire communication. Illegal interception alone constitutes a crime under 18 U.S.C. Sec. 2511 et seq. In *Lee*, the Orlando police department installed a party-line to petitioner's phone in a neighboring house. The police then proceeded to monitor and record all party line conversations by use of an automatic actuator, a tape recorder, and a set of earphones. The evidence gained from such monitoring was held to be inadmissible in the state court trial of Lee. The Supreme Court, in comparing the *Lee* situation with the one in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), where evidence obtained from an interception was held admissible, pointed out that, in *Lee*, "there was neither 'the consent of one party' nor a 'regularly used' telephone 'not . . . installed . . . just for (the) purpose' of surveillance." *Lee*, 392 U.S. at 381, 88 S.Ct. at 2099. The same distinction from *Rathbun* is present here. There was no consent of any party to a conversation and this Court has already concluded the telephone was not regularly used for any purpose other than monitoring.

The Supreme Court in *Lee* further stated that "This is not a case, however, where the police merely picked up the receiver on an ordinary party line, and we need not decide whether § 605 would be applicable in those circumstances." Id. at 381, 88 S.Ct. at 2098. The Court went on to point out in a footnote that there was nothing in the language or history of Sec. 605 to indicate that Congress meant to afford any less protection to those who, by virtue of geography or financial hardship, must use party-line telephones. Id. at 381, n. 1, 88 S.Ct. 2096. This Court feels the same is true of 18 U.S.C. Sec. 2511 and points out that while the Supreme Court spe-

cifically did not decide the situation involving an "ordinary party line", the roadblock telephone in this case was not any ordinary party line. Even if the roadblock phone had not been installed specifically for the purpose of surveillance, such surveillance necessarily became the purpose when the phone was put to no other use.

Relying on the similar circumstances in Lee v. Florida, the wording of 18 U.S.C. Secs. 2510–2511, and the evidence presented in the adversary hearing, this Court finds substantial support for declaring the government use of the telephone at roadblock one to be an illegal interception of a wire communication.

B. *No need for expectation of privacy.*

■ Contrary to government contentions, there is no expectation of privacy requirement for a *wire,* as opposed to an *oral* interception. See 18 U.S.C. 2510, United States v. Pui Kan Lam, 483 F.2d 1202 (2 Cir. 1973), and United States v. Carroll, 332 F.Supp. 1299 (D.D.C.1971).

■ There is one other assertion by the government which deserves mention here. The government claims that the defendants were illegally in possession of the Trading Post and the town of Wounded Knee and therefore, any overhearings of conversations would not constitute an interception under 18 U.S.C. Sec. 2511. In disagreeing with this contention, I would point out three considerations: (1) the illegality of the defendants' presence in Wounded Knee is one of the matters that will be decided by this whole trial. No prejudgment can be made as to the legality or illegality of the siege/occupation.

(2) The cases cited by the government to support its contention are inapropos. United States v. Lam, *supra*, involved the overhearing of an oral, not wire communication. It was there held that defendants had no right to an expectation of privacy in an oral conversation when they were committing an illegal act in someone else's home. The cases of Flaherty v. State, Arkansas Supreme

Court, 500 S.W.2d 87, October 1, 1973, and United States v. Pasha, 332 F.2d 193 (7th Cir. 1964), both involved a police or government agent listening as one of the *parties* to a phone conversation. Both those cases thus fall under the exception of 18 U.S.C. Sec. 2511(2)(c) which provides:

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(3) Finally, the telephones in both the *Flaherty* and *Pasha* cases had been in existence and used in the ordinary course of business before the listening took place. The same is not true of the roadblock phone which was used solely for monitoring purposes.

C. *Treaty of 1868*

As an alternative ground charging the illegality of the monitoring, the defendants contend that it is violative of the Sioux Treaty of 1868. Article I provides:

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Having found the monitoring violative of 18 U.S.C. Sec. 2510 et seq., this court finds it unnecessary to pass upon that contention.

D. *Standing*

■ Although under Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), codefendants and co-conspirators have no special

standing and cannot prevent the admission against them of information which has been obtained through electronic surveillance which is illegal against another, both Dennis Banks and Russell Means have standing in this action challenging the illegal telephonic interception. Although those FBI agents who admitted monitoring phone conversations gave more indication that Dennis Banks' voice was overheard, the memorandum of agent Bertinot contains the statement that he "picked up the receiver of the phone and heard voices of individuals who later identified as either Russell Means or Dennis Banks and entertainment personality Dick Cavett." This indication that Means could have been overheard, plus the fact that unidentified male voices (which could have been Means') were heard by other FBI agents, both of which are unrefuted, support the Court's conclusion that both defendants have standing in this case.

■ As a result of this court's conclusion that an illegal wire interception occurred by the government monitoring of the telephone at roadblock one, all evidence obtained as a result of said monitoring will be inadmissible in the trial of United States v. Dennis Banks and Russell Means. Any exculpatory or proper Jencks Act material surfacing as a result of the monitoring shall be immediately turned over to defendants by the government, and any inculpatory evidence derived from the monitoring shall be suppressed.

## POINT II—FAILURE TO COMPLY WITH THE DISCOVERY ORDER.

The defendants set forth a large number of alleged violations of this Court's discovery order. Before analyzing the government's specific failures, it must be pointed out that they do not encompass that failure for which the sanction of dismissal is most appropriate—the destruction or loss of evidence.[2] Nowhere is it alleged that there exists a specific piece of evidence which cannot be made available to the defense. The defendants contend, nevertheless, that the prosecution should be dismissed. It is the contention of the defendants that the number and nature of the transgressions of the discovery order lead to the conclusion that the government engaged in a purposeful or grossly negligent attempt to impede the orderly carrying out of the court's discovery order and that the delays in obtaining the evidence work to the irremedial prejudice of the defendants. The defendants contend also that the number and nature of those transgressions creates an implication of bad faith on the part of the government, and that any further reliance upon the government to comply with its continuing duty under the discovery order is misplaced and hopeless.

Perhaps the case most strongly supportive of the defendants' position is United States v. Seafarers International Union of North America et al., 343 F. Supp. 779 (E.D.N.Y.1972). Certain officials of a labor union were charged under the Federal Corrupt Practices Act with collecting and disbursing funds for political purposes. The court thus characterized the government's failure to comply with the court's discovery orders:

. . . the court finds that the Government has chosen to embark on a course of purposeful conduct designed to secure a tactical advantage, resisting both suggestions and orders of two judges of the court to furnish the defendants with requisite pretrial dis-

---

2. Even when evidence is lost or destroyed, even when its benefits are denied the defendants forever, which is not the case here, the drastic sanction of dismissal does not flow automatically. Outright dismissal is justified in two instances: (1) where the government fails in its heavy burden of proving that it made earnest efforts to pre-serve the evidence, United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1968), United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971); and (2) where the lost evidence is so vital to the defense of the case that a fair trial is impossible without it. United States v. Heath, 260 F.2d 623 (9th Cir. 1958).

closure while, simultaneously, demanding an early trial date. Id. at 789.

The court dismissed the case. But it was not the government's failure to comply with the discovery orders which ended the case. It was the fact that the failure caused a delay of 23 months, during which the defendants' key witness, the only defendant named in the substantive, non-conspiracy count, died. The court concluded that the delay had seriously prejudiced the defendants and that, to force them to defend would result in a denial of their right to a speedy trial and to due process of law. In the case before this court, neither does the conduct of the government approach that of the prosecution in *Seafarers*, nor is there any element of an incurably prejudicial delay.

The defendants characterized the governmental attempt at compliance with this court's order in the following language:

Discovery after the court order of October 16, 1973, and before trial, can be characterized as delayed, painfully guarded, intentionally obscure and unresponsive in general. The most significant evidence was "discovered" only after the defendants had proof or strong hints of its existence. Initiative for compliance with the order on behalf of the government was almost non-existent.. Defendants' brief at 96.

Thus, more than complaining about the government's dilatory production of specific pieces of evidence, the defendants charge the government with an obstructionist attitude, prejudicial to the defendants, and violative of the enlightened discovery principles set forth in United States v. Bryant, 142 U.S.App. D.C. 132, 439 F.2d 642 (1971):

These cases point up an anomaly of our criminal process: controlled by rules of law protecting adversary rights and procedures at some stages, the process at other stages is thoroughly unstructured. Beside the carefully safeguarded fairness of the courtroom is a dark no-man's land of unreviewed

bureaucratic and discretionary decision making. Too often, what the process purports to secure in its formal stages can be subverted or diluted in its more informal stages. . . .

The right at stake in the cases before us is defendant's discovery of evidence gathered by the government, evidence whose disclosure to defense counsel would make the trial more a "quest for truth" than a "sporting event." Id. at 644.

The purpose of the duty is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather, it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the government. Id. at 648.

This court is in hearty agreement with the principles and purposes set forth in *Bryant*. What is more, this court is in partial agreement with the defendants' characterization of the government's compliance with the discovery order. This court agrees that the government's response has been dilatory, and that initiative for compliance with the order on behalf of the government was considerably weaker than it should have been. This court refuses to conclude, however, that non-compliance sprang from any bad faith on the part of the prosecutor or the FBI. The dilatory compliance, rather, was the result of three factors: (1) the negligent failure of the prosecutor to fully comprehend the importance and the extent of his responsibilities with regard to discovery; (2) the voluminousness of the files required to be searched in pursuit of discoverable material; and, (3) the negligence of the FBI and other law enforcement organizations in making the search.

On March 6, 1974, Assistant United States Attorney Hurd conceded to the court that he had never examined any of the FBI files but had simply

asked the FBI to make available those things which the FBI thought discoverable under the court's order. Given the necessarily broad language of the discovery order, given the voluminousness of the files, and given the comparative unfamiliarity of the FBI agents with the intricacies of the case, this failure of the prosecutor to search the files evidences a serious underestimation of his responsibility to assure the production of discoverable material. Assistant United States Attorney David Gienapp testified that he had doubted that full discovery was possible since November or December of 1973. His failure to apprise the defendants and the court of that fact evidences a like underestimation. There can be no division of function between the forces of the prosecution and the forces of the investigative agencies when it comes to assuring that the defendant is provided with all materials to which he is entitled. Not only does the prosecutor assume the *responsibility* of seeing to it that the court's discovery order is complied with, but, in light of his specialized knowledge of the case, he must assume that *function*. It is the prosecutors themselves who must personally direct a search of the files in pursuit of discoverable material.

That does not mean, however, that the FBI escapes reprimand with respect to discovery procedures in this case. Indeed this transcript proliferates with what this court concludes to be negligent and impedimentary conduct of the FBI in complying with the discovery order. The following are the specific instances of such misconduct: (1) at an initial discovery session, the FBI refused to provide defense counsel with an inventory list of the property to be examined, which list contained the details of the recovery of the pieces of evidence and which list was essential to the defense counsel's attempt to get maximum benefit out of the examination; (2) roadblock and radio transmission logs were not turned over until specific request for them was made; the director of the Marshal's Service had first represented that there were no Marshals' logs of intercepted radio communications, only to have them surface through the testimony of a deputy Marshal at trial; (3) aerial pictures were not turned over until proof of their existence was furnished; (4) there was a delay in getting medical lab reports to the defendants; (5) the Carter Camp letter, which implicated Banks and Means in the conspiracy, was not turned over until the trial was in progress; (6) the government failed to turn over a tribal court petition and order, which petitioned that the Marshals enter the reservation to preserve order, until the case was in progress; (7) an alleged petition signed by a number of residents of Wounded Knee requesting that the FBI and the Marshals refrain from attempting to drive AIM from the reservation was withheld from defense until the matter was inadvertently brought up during the government's case, at which time a copy was presented to defense counsel and represented to be a copy of the original; after a witness had testified adversely to the defendants based upon the copy, upon which there were notations by FBI agents and others, the original was produced, requiring further examination of the witness and an undoubtedly confusing explanation to the jury; (8) failure to produce a number of documents (Exhibits J, T, and U) bearing upon the existence and the fruits of electronic surveillance.[3] After the complicated incident involving the altered petition, the court ordered the FBI's files be kept intact and permitted defense counsel and the prosecution time to go through them.

---

3. With regard to the existence of electronic surveillance, it might be pointed out that this entire hearing might not have taken place had it not been for the fact that Mark Lane, on February 18, 1974, while waiting to testify before the Grand Jury in Deadwood which was investigating the death of Pedro Bissonette, had a chance conversation with Joseph Pourier during which the phone installation was revealed.

The search produced 131 discoverable or arguably discoverable pieces of evidence which had not been turned over.

The defendants have expressed a profound mistrust toward the FBI and any procedure whereby the FBI would make the final determination as to the discoverability of evidence. This expression of mistrust is understandable, although I cannot bring myself to the conclusion that the FBI has purposefully suppressed evidence. The behavior of the FBI in this case is negligent at best. Although the FBI has had the well-deserved reputation of being the world's most effective crime-fighting organization, it must be remembered, if our system of freedoms is to be preserved, that the FBI must be servile to our system of justice. The FBI is an independent crime-fighting organization which should be taking its direction, at least in the area of domestic crime, soley from prosecuting attorneys in the Justice Department and in the districts around the country. Implementation of this strongly held viewpoint was undertaken in this case when I ordered that the prosecutor be allowed to peruse the FBI informant files in search of discoverable material. Both Attorney General Saxbe and his assistant in charge of the Criminal Division, Henry Petersen, apparently agreed with that court order. The FBI should be subject to the same ethical standards as its principal, the prosecutor:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his

duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

■ The FBI in this case failed as a "servant of the law." The many revelations of Bureau negligence, or Bureau dilatoriness have brought this court to the brink of dismissing this case. I must conclude, however, that, although they may have been careless, the FBI failures to comply with the discovery order were not purposeful. What is more, they have not acted toward the irremedial prejudice of the defendants' case. It is yet early in the trial. The government has not yet completed one-fifth of its intended witnesses. The defendants should now or soon be in possession of all discoverable materials in the possession of the FBI. This court, four weeks ago, ordered an extensive search of the FBI files for all discoverable material. Hopefully, that search will be close to completion by the time this trial resumes. It must also be remembered that the defendants, if they are dissatisfied with the governmental compliance, may move for a dismissal or a mistrial at any further stage of the proceeding.

It is therefore the order of this court, pursuant to the Rule 16(g) of F.R. Crim.Pr., that the search of the FBI files continue for the next eleven days while this trial is in recess and for as long thereafter as is necessary to complete the search, and that the government permit the discovery or inspection of discoverable materials not previously disclosed. It is also ordered that the government is prohibited from introducing any material which is discoverable under Rule 16 and which the government has failed to turn over prior to March 8, 1974.

## POINT III—OVERHEARING OF ATTORNEY-CLIENT CONVERSATIONS

The defendants charge that the government utilized the telephone at roadblock one to surreptitiously monitor tele-

phonic conversations between the occupants of Wounded Knee and their lawyers. It must first be pointed out that there was no direct evidence that anyone overheard a lawyer-client conversation. If those overhearings did occur, they were not revealed by the responses to the teletypes disseminated by the FBI, and no record found thus far has preserved those conversations. Thus, unless we can imply either that there was regular monitoring or that other reports of periodic monitoring were destroyed or kept from the courts, it must be concluded that there were no overhearings of lawyer-client conversations.

■ Even if it can be concluded that there were overhearings, there must be some showing that the defense was prejudiced. Hoffa v. United States, 385 U. S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. Zarzour, 432 F.2d 1 (5th Cir. 1970). The fact situation in *Zarzour* is far more exacerbated than that in the instant case. The defendant was arrested for bank robbery. Defense counsel hired a legal investigator who also was in the employ of the FBI, apparently a willing double agent. Testimony at an evidentiary hearing established that Wilder (the informant) had turned over information to the FBI relating to the bank robbery, but he denied turning over any information concerning the defense of the case. The prosecutor testified that he received no information from Wilder, and that he did not even know about his employment. The FBI agent in charge of the investigation testified that he never told the government about Wilder's activities. Wilder testified that he in no way acted on behalf of the government regarding appellant Zarzour's trial. The trial court was directed to take the same steps which this court has already taken to assure himself that there was no prejudice:

In the case sub judice the district court must determine whether there were any disclosures by the FBI to the government prosecutors and

whether any information passed between Wilder and the FBI. To accomplish this fairly, the district judge is directed to conduct an in camera examination of the FBI informant files on Wilder, but only concerning his dealings between the date of the robbery of the . . . Bank . . . and the time of . . . trial. . . . A determination can be made by examining all written memoranda in the files as to whether the government obtained any evidence through the employment of Wilder concerning appellant or the key witnesses in his case, and whether there was any interference with his Sixth Amendment rights to counsel and an adversary proceeding. Id. at 4.

There has been no indication in the case before this court that the prosecution or the FBI has had access to any information derived from monitorings of lawyer-client conversations.

■ The defendants cite the cases of Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) (accused's hotel room was monitored during grand jury investigation), O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) (a listening device was planted in the business establishment of an acquaintance of the accused after indictment), Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), and Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951) (interceptions of telephone conversations between accused and counsel before and during trial), for the proposition that, where there is gross misconduct on the part of government, the defendant need not prove that the overhearings prejudiced his defense. Even if those cases can be cited for that proposition, this court cannot conclude that the placing of the phone at the roadblock, the periodic monitorings, and the negligence of the government in failing to apprise the court and the defense of these monitorings constitute the "gross misconduct" which defendants contend to be the deciding factor in

those cases. I cannot conclude that the phone was installed for the purpose of intercepting attorney-client conversations, nor can I conclude that it was used for that purpose. I think the government has met its burden of proving (1) that there were no overhearings of attorney-client phone calls; (2) that, if there were such overhearings, the prosecution did not have access to the information thus acquired, and (3) that there was no gross governmental misconduct.

## POINT IV—GENERAL GOVERNMENTAL MISCONDUCT AND DISHONESTY

The fourth area of allegations contained in defendants' Motion to Dismiss is an all-encompassing one. It embraces the allegations of illegal wiretapping, interception of attorney-client conversations, failure to comply with the discovery order, and official governmental dishonesty: It is the contention of the defendants that the combination of these factors has raised the level of government misconduct to such a point that it would be unconscionable to allow the government to proceed and that it has irretrievably prejudiced the right of the defendants to a fair trial.

This fourth ground is the most difficult with which to deal. Rather than involving a specific instance of misconduct such as an illegal search and seizure, for which the exclusionary remedy is sufficient, it allegedly involves repeated instances of governmental misconduct which permeate the case and make it impossible for the defendants to get a fair trial. It involves instances of governmental misconduct, which, standing each by itself, would not warrant outright dismissal, but which, standing together, allegedly evidence the kind of intentional and inherent governmental obstructionism which will now, and in the future, prevent the defendants from getting a fair trial.

The case upon which defendants primarily rely is Ellsberg v. United States. Having reviewed the transcript of Judge Byrne's oral opinion and having read the defendants' briefs and researched the cases cited therein, I must conclude that the governmental misconduct in the instant case does not stoop nearly to the depths of that in *Ellsberg*.

The disclosure of the burgling of Daniel Ellsberg's psychiatrist's office by the CIA-equipped, presidentially-inspired special unit was only the final assault upon the judicial process in a case which was littered with such outrageousness.[4] The government had time and time again failed to make timely production of exculpatory information, causing delays and disruptions of the trial. After both sides had rested their cases, the government disclosed that there had been electronic surveillance. It was impossible to learn how much surveillance existed or what information was discovered by its use. Logs, tapes, records, and authorizations for the wiretaps had either never existed or had been lost (apparently Judge Byrne's opinion and Mr. Kunstler's recollection conflict on this point). Although not mentioned in Judge Byrne's opinion, the defendants' brief alleged the electronic surveillance of journalists the records of which had been destroyed. The brief also alleges electronic surveillance of lawyer-client and lawyer-defense witness conversations. In the face of this misconduct, Judge Byrne concluded that he was powerless to give the defendants a fair trial, at that time or at any time in the reasonable future.[5]

4. An example of the arrogant ruthlessness with which Ellsberg and Russo were pursued by the Executive branch is an absolutely outrageous episode which occurred during the pendency of the trial. Judge Byrne was invited to the summer home of President Nixon at San Clemente, where John Erlichman, a special assistant to the president, broached to him the possibility of an appointment to the directorship of the FBI.

5. "There is no way the defendant or the Court, or indeed, the government itself can test what effect these interceptions may have had on the government's case here against either or both of the defendants.

**334**

In the case before this court, it cannot be said that the governmental misconduct has "incurably infected" the prosecution of this case. First, there are ways in which we can test for and eliminate the effect of the interceptions upon the government's case. Although deserving reprimand for the way in which they worded the teletypes[6], the FBI canvassed the agents who were positioned at the roadblock and elicited whatever information they may have intercepted. The FBI, admittedly at a late date, produced memoranda submitted by those agents reflecting the conversations which they overheard. None of those records had been lost or destroyed. They were in the FBI files and were produced when the question arose at trial. All of those agents who responded affirmatively to the teletype took the stand and submitted themselves to cross-examination. Any evidence intercepted by them is hereby suppressed. It must be emphasized that this court is not forced to contend with a situation where the government reveals surreptitious wiretapping after both sides have rested, no matter how fortuitous that circumstance may be. The revelation has been elicited at an early point in the trial. If nondisclosure was part of a purposeful attempt to obstruct the judicial process, we would have a different

question, but I do not think that conclusion is warranted.

The defendants point to a number of instances of alleged governmental dishonesty and obstructionism which, they contend, warrant dismissal.

Joseph Trimbach, the Special Agent in charge of the Minnesota, South Dakota, North Dakota division of the FBI, made specific assurances to this court that there were no wiretaps at Wounded Knee, legal or illegal. He also testified that he had neither seen nor signed an affidavit supporting a request for a judicial wiretap authorization. All these statements were untrue. This court accepts, however, Mr. Trimbach's explanation that events were so much in control of men at Wounded Knee, that he had forgotten both about the phone at roadblock one and about the wiretap authorization affidavit.

Defendants point to what they contend to be purposeful attempts to keep Trimbach's impeaching affidavit from the defense.[7] In light of the utter stupidity which such a purposeful attempt would require, I cannot conclude that the attempt was purposeful. Assistant United States Attorney Hurd had admitted to the court and counsel at the inception of this hearing that a wiretap authorization attempt had been considered. Whether or not Trimbach signed an af-

---

. . . Moreover, no investigation is likely to provide satisfactory answers where improper government conduct has been shielded so long from the public view and where the government advises the Court that pertinent files and records are missing or destroyed. (T. 22,689).

.        .        .        .        .

"The totality of the circumstances of this case which I have only briefly sketched offend a sense of justice. The bizarre events have incurably infected the prosecution of this case."

6. In that teletype sent out by the FBI on March 13, 1974, it is twice pointed out to the agents that their responses could provide the basis for a Motion to Dismiss. It is pointed out once in the prefatory material, and again after the questions relating to the roadblock are posed.

7. The following are the circumstances leading the defense to the conclusion that there was a purposeful attempt: (1) the FBI knew about the Parker activities and affidavit (Parker's activities culminated in a wiretapping authorization request subsequent to that supported by the Trimbach affidavit) at least since March 13, 1974, implying that they knew also of Trimbach's affidavit; (2) the Trimbach affidavit was found in the FBI files on March 13 or 14, 1974, pursuant to this court's subpoena for all wiretap information, but, allegedly due to a clerk's miscue, only page two which was unsigned and did not contain Trimbach's name, was forwarded to the prosecutors; (3) there were repeated delays to the defense acquisition of Parker's response to a special teletype sent him on March 13, 1974, inquiring about the wiretap authorization.

fidavit has such minimal bearing upon the issues, and his explanation that he had forgotten that he had signed it amidst the confusion of marshalling a small army has so much the sound of truth, that there would be no sense in trying to cover up the Trimbach affidavit. Despite the suspicious nature of the events leading to the affidavit's disclosure, I must conclude that there was no purposeful attempt to keep the Trimbach affidavit from the court.

Defendants contend that the FBI demonstrated its hostile attitude when, at the discovery conferences of March 9 and 12, 1974, the agents denied the existence of any portion of the general Wounded Knee file which the defense counsel had not seen. That misunderstanding might have been caused by some confusion about this court's order. This court excepted all internal FBI memoranda and documents from the purview of both discovery orders. It was in this context, I think, that the agents made their representations.

The defendants point to numerous instances where either the Justice Department, the FBI, or the Marshal's service represented to the United States Attorneys and the defendants' counsel that certain discoverable materials were not in existence. As I set forth in the portion of this opinion dedicated to discovery violations, I would attribute those misrepresentations to negligence, and not to any purposeful intention. The same is true of the representations of the United States Attorney to this court that there were no paid informants prior to the takeover at Wounded Knee.

One disturbing defense allegation, touched on before, deals with the wording of the teletype which went to all FBI regional offices. Contradictions between the contents of some of the affirmative responses and the testimony of those responding agents in court would indicate that the wording might indeed have had an intimidating effect. The wording is regrettable and deserving of reprimand. But the totality of the testimony convinces me that the entire story

on the extent of monitoring was brought out at the hearing.

Defendants have moved for an order to show cause why Joseph Trimbach, Herbert Hoxie and Ray Gammon, special agents of the FBI, should not be cited for contempt for willful disobedience of court orders. Whatever disobedience may have been committed was not willful. The motion is hereby denied. Defendants also moved that the above named together with other named and unnamed FBI agents be referred to the United States Attorney for the District of Minnesota and South Dakota for investigation of charges of violations of the Sioux Treaty of 1868. This court has no jurisdiction to make that referral. The motion is hereby denied.

## SUMMARY

I want to point out that this case is still in its nascent stages. I have detailed what I feel to be incidents of conspicuous and repeated negligence on the part of the government. Although I am constrained not to dismiss the case at this point, the government should be forewarned that this court will continue to be acutely aware of its compliance, or lack thereof, with this court's discovery order and with the rules of law. The words of Justice Brandeis will not be forgotten by this court:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to

secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face. Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, dissenting).

If further misconduct occurs on the part of the government, I would certainly consider a renewed motion by the defendants. It is my deepest hope and expectation that such a renewal shall not be necessary.